**Henry D. BRANDAL, Appellant,**

v.

**STATE of Alaska, COMMERCIAL FISHERIES ENTRY COMMISSION, Mary McDowell and Frank Homan, Commissioners, and Bruce Twomley, Chairman, Appellees.**

No. S–11770.

Supreme Court of Alaska.

Feb. 3, 2006.

---

James Vollintine, Anchorage, for Appellant.

Zachary P. Falcon, Assistant Attorney General, and David W. Márquez, Attorney General, Juneau, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

This case arises from the Commercial Fisheries Entry Commission's (CFEC) denial of Henry Brandal's application for a limited entry permit to fish in the Chignik purse seine fishery. Brandal, who has lived and fished in Kodiak for four decades, initially applied for a permit in 1977 and received a recommended decision denying his application in 1982. But the application was not officially denied for another twenty-two years, during which Brandal continued to fish.

Brandal appeals the superior court's affirmance of the CFEC's decision on both substantive and procedural grounds. He alleges that the CFEC erred in calculating his income dependence points under the Limited Entry Act and that the regulations relied upon by the CFEC were improperly promulgated under the Administrative Procedures Act. In addition, he claims that the delay violated his right to due process, and he seeks a remedy under the doctrines of unreasonable delay and quasi-estoppel.

But because Brandal was not originally entitled to a permit and the CFEC's 1982 recommended decision provided Brandal with ample notice that his application was likely to be denied, we affirm the judgment of the superior court.

## II. FACTS AND PROCEEDINGS

### A. Factual History

The facts in this appeal are undisputed. Henry Brandal, a Kodiak resident, has fished in the Chignik purse seine fishery since 1965, when he worked as a crew member for his grandfather. He started working for his father as a skiff person in 1966, at age nine, as part of a family fishing operation. He held a commercial license and worked as a crew member for his father from 1967 through 1972, but his father was the one who held the gear licenses and made landings in the Chignik fishery. Between 1970 and 1973 Brandal would operate the boat on occasions when his father was absent due to illness, but the gear license was never transferred to Brandal.

Brandal was a gear license holder in 1974 and applied for a Chignik limited entry permit on October 27, 1977 based on his participation in the fishery as a first-time gear licensee in 1974. Twenty points are needed

to qualify for an entry permit,[1] and Brandal claimed twenty-eight points in his application: one point for each year of crew participation from 1965 to 1972 (eight points total); six points for investment in a vessel and gear; four points for availability of alternative occupations; six points for 1972 income dependence; and four points for 1971 income dependence.

## B. Procedural History

In February 1978 the CFEC found that Brandal had zero points, and denied his application. The following month, Brandal's father requested a hearing on the application. A hearing was held in Seattle in February 1979 and, on April 14, 1982, the hearing officer issued a recommended decision denying Brandal's application, finding that Brandal should only be awarded ten points on his application. The officer awarded Brandal six points for crew member participation from 1967 through 1972 and four points for availability of alternative occupations, for a total of ten points. The income dependence points that Brandal had claimed for 1971 and 1972 were denied because he did not participate as a gear license holder in either year, a requirement for earning points under the regulation.[2]

During the pendency of his application Brandal was issued an interim permit that allowed him to continue fishing in the Chignik fishery. Twenty-two years later, on April 14, 2004, the CFEC issued a final decision that awarded Brandal two additional points for crew participation in 1965 and 1966, but denied his application because it fell short of the necessary twenty points.

Brandal 'appealed the CFEC's decision to the superior court, challenging the CFEC's findings on past participation and income dependence. He also claimed he should have been awarded unavoidable and special circumstances points. He also claimed that the CFEC's entry permit policies violated the Due Process and Equal Protection Clauses of the United States and Alaska Constitutions, as well as the rulemaking requirements of the Alaska Administrative Procedures Act. Finally, Brandal contended that the CFEC's twenty-two-year delay in issuing a final decision deprived him of due process. In November 2004 the superior court denied all of Brandal's claims and affirmed the CFEC's decision. Brandal's petition for rehearing was also denied, and this timely appeal followed.

## III. DISCUSSION

### A. Standard of Review

■■■■ When reviewing an agency's administrative decision, we "independently review the merits of an administrative determination"[3] and are not required to give deference to the lower court's determination.[4] We apply four standards of review to administrative decisions: (1) the substantial evidence test for questions of fact; (2) the reasonable basis test for questions of law involving agency expertise; (3) the substitution of judgment test for questions of law where no expertise is involved; and (4) the reasonable and not arbitrary test for review of administrative regulations.[5] "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[6] We review questions of law and issues of constitutional interpretation de novo under the substitution of judgment standard.[7]

---

1. *See* 20 Alaska Administrative Code (AAC) 05.600 (2005) (establishing a priority classification system, with scores ranging from zero to forty points, to reflect "the degree of hardship the applicant would suffer by exclusion from the fishery"); 20 AAC 05.640(a) (2005) (providing that permits are to be issued to those who have scores of twenty or above).

2. *See* 20 AAC 05.630(b)(1).

3. *Simpson v. State, Commercial Fisheries Entry Comm'n,* 101 P.3d 605, 609 (Alaska 2004).

4. *Leuthe v. State, Commercial Fisheries Entry Comm'n,* 20 P.3d 547, 550 (Alaska 2001); *see also Handley v. State, Dep't of Revenue,* 838 P.2d 1231, 1233 (Alaska 1992).

5. *Handley,* 838 P.2d at 1233.

6. *Crivello v. State, Commercial Fisheries Entry Comm'n,* 59 P.3d 741, 744 (Alaska 2002).

7. *Simpson,* 101 P.3d at 609.

## B. The CFEC's Calculation of Brandal's Points

### 1. The gear license requirement and the special circumstances provision

■ The Limited Entry Act, enacted in 1973, is designed to "promote the conservation and the sustained yield management of Alaska's fishery resource and the economic health and stability of commercial fishing in Alaska by regulating and controlling entry of participants and vessels into the commercial fisheries in the public interest and without unjust discrimination." [8] To this end, the Act restricts use of commercial fisheries to persons who have established economic dependence on the fishery by fishing while holding gear licenses. [9] The CFEC administers the Act by assigning points to applicants based on their past use of the fishery. [10] Those who score twenty points or higher (on a scale ranging from zero to forty) are entitled to permits. [11]

Since 1973 a line of cases interpreting the Limited Entry Act has clarified the general requirements for obtaining a permit and the particular circumstances under which points can be awarded. In *Isakson v. Rickey*, [12] we held that a portion of the Act, codified in AS 16.43.260(a), denying permits to those who did not possess a gear license before January 1, 1973 violated the Equal Protection Clauses of both the Alaska and federal constitutions. As we noted, this requirement undercut one of the stated purposes of the Act by discriminating against many applicants who "would be able to demonstrate substantial indicia of hardship as a result of their exclusion from commercial fishing." [13] As a result of this decision, the CFEC created a new class of applicants, composed of fishers who first obtained licenses in 1973 and 1974, and permitted these applicants to claim the gear license points necessary to obtain a permit. [14]

In *Commercial Fisheries Entry Commission v. Templeton*, [15] we considered the question whether a fisher whose gear license was held in the name of a partner in 1971 and 1972 could claim gear license points. Templeton, who was a co-owner and operator of the fishing vessel, relied on a regulation allowing an applicant to claim up to ten points "if special circumstances exist such that an applicant's income dependence is not realistically reflected by his income dependence percentage for the years 1971 and 1972." [16] Because "allocating one permit between two partners solely on the fortuitous circumstances of which one held the gear license in two given years does not realistically weigh the relative hardship which each partner would suffer by denial of a permit," we affirmed the superior court's award of ten points for income dependence and an entry permit. [17]

We clarified the *Templeton* holding in *Kalmakoff v. State, Commercial Fisheries Entry Commission*. [18] Kalmakoff, who sought a permit to fish in the Chignik purse seine fishery, had fished under another person's license in 1971 and 1972, but he had been a crew member rather than a co-owner of the boat. [19] We declined to extend *Templeton's* holding to crew members, noting that crew

---

**8.** AS 16.43.010–.990 (1973).

**9.** *Id.*

**10.** *See* 20 AAC 05.600 (2005) (providing for a point system based in part of the "extent of past participation in the fishery").

**11.** 20 AAC 05.640(a).

**12.** 550 P.2d 359, 365 (Alaska 1976) (striking down the portion of the Limited Entry Act codified in AS 16.43.260(a)); *see infra* note 14.

**13.** *Id.* at 365.

**14.** 20 AAC 05.630 (2005). Although *Isakson* changed the date by which an applicant must have obtained a gear license, we have held that

the gear license requirement itself is constitutional. *See Commercial Fisheries Entry Comm'n v. Apokedak*, 606 P.2d 1255, 1263–64 (Alaska 1980) (holding that the gear license requirement does not violate the federal Equal Protection Clause because it is "rationally related to the goal of preventing unjust discrimination in the allocation of entry permits").

**15.** 598 P.2d 77 (Alaska 1979).

**16.** 20 AAC 05.630(b)(2).

**17.** *Templeton*, 598 P.2d at 81.

**18.** 693 P.2d 844 (Alaska 1985).

**19.** *Id.* at 850–51.

members were less likely to suffer hardship from being forbidden to fish than gear license holders or co-owners operating under a partner's gear license.[20]

### 2. Brandal's claim under the special circumstances provision

Brandal claims that, because he obtained his gear license in 1974, his "income dependence is not realistically reflected by his income dependence percentage for the years 1971 and 1972," entitling him to "special circumstances" points under 20 AAC 05.630(b)(2). This argument is unpersuasive for two reasons.

First, "special," as used in 20 AAC 05.630(b)(2), "assumes that the usual has not occurred, or conversely, that something unusual has occurred."[21] Circumstances other than having been a co-owner who fished on a partner's gear license can qualify as special,[22] but "we [have] not h[e]ld that being a crew [member], as opposed to a gear license holder or a gear license holder's partner, is a 'special circumstance.'"[23] Although Brandal worked on his father's boat in the years preceding 1974, he did so as a crew member, not a co-owner. For that reason, his situation is analogous to Kalmakoff's, which was not covered by the special circumstances exception.

Second, although *Isakson* permits those who first obtained gear licenses in 1973 and 1974 to apply for permits, it does not forbid the CFEC from favoring 1971 and 1972 gear license holders over *Isakson* applicants. "[I]t was reasonably necessary, in furtherance of the purpose of evaluating and avoiding hardship, to favor people who had held gear licenses in 1971 or 1972 over people who

first held gear licenses after 1972 and people who last held gear licenses before 1971."[24] Those who held licenses in the years immediately preceding the passage of the Limited Entry Act were more likely to suffer hardship from being forbidden to fish than former licensees who had changed careers and future licensees who had not yet committed themselves to making a living from the fishery.[25] The special circumstances provision thus focuses not on hardship in general, but rather on the hardship that an established, career fisher would have experienced in 1973 from suddenly being forbidden to fish. "Admittedly, hardship evaluated as of 1973 is not the same thing as present hardship, but this is a choice ... which the legislature has explicitly made."[26]

Brandal began fishing as a crew member long before the passage of the Limited Entry Act, but he did not acquire a gear license until 1974 and he was not the co-owner of a vessel in 1971 or 1972. Although the CFEC's unconscionable delay has given Brandal over two decades to invest in fishing equipment, and Brandal may experience significant economic hardship from being forced to change careers, he does not fall within the narrow class of fishers that the special circumstances provision was designed to protect. As we emphasized in *Isakson*, the Limited Entry Act contemplates that "hardship w[ill] be determined as of January 1, 1973."[27] Without condoning the Commission's conduct, we hold that the CFEC did not err in refusing to award Brandal additional points under the special circumstances provision.

### C. The CFEC's Compliance with the Administrative Procedures Act

■ Brandal contends that, under the Ad-

---

20. *Id.* at 853–55.

21. *Rose v. Commercial Fisheries Entry Comm'n,* 647 P.2d 154, 162 (Alaska 1982) (discussing the relationship between "special" and "unavoidable" circumstances, and concluding that "unavoidable" means both special and unavoidable).

22. *See, e.g., Jones v. Commercial Fisheries Entry Comm'n,* 649 P.2d 247, 251 (Alaska 1982) (requiring the CFEC to consider a fisher's claim of special circumstances where the fisher was unable to fish during the relevant period because his boat had been destroyed).

23. *Kalmakoff,* 693 P.2d at 852; *see also id.* at 855 n. 20 (noting that "crew [members], as a class, would have suffered less hardship by being forbidden to fish in 1973 than would the class of gear license holders").

24. *Id.* at 854.

25. *Id.*

26. *Id.* at 853.

27. 550 P.2d at 364.

ministrative Procedures Act,[28] "the CFEC was required to formally publish and adopt regulations setting out its policy on income dependence and informing *Isakson* applicants that their applications were inherently futile unless they were partners of gear licensees in 1971–72." But Brandal's premise that no *Isakson* applicant who was not the partner of a gear license holder in 1971 or 1972 can receive a permit is demonstrably incorrect. At least two *Isakson* applicants who have not been partners of gear licensees have received scores of twenty points or higher by demonstrating "special" or "unavoidable" circumstances under 20 AAC 05.630(a)(5) or (b)(2).[29]

And even if this were not the case, the public has received ample notice of the procedures controlling permit applications. In addition to the general regulations promulgated by the CFEC,[30] we have provided specific, detailed guidance about the treatment of applicants who did not hold a gear license in 1971 or 1972.[31] We therefore hold that the CFEC did not violate the Administrative Procedures Act by denying Brandal's application.

### D. Brandal's Due Process Claim

 Brandal's next argument is that his right to due process was violated by the CFEC's twenty-two-year delay in handling his case. As Brandal correctly notes, the right to due process extends to participants in administrative proceedings.[32] "Alaska has adopted the three-part balancing test outlined in *Mathews v. Eldridge* to determine whether administrative proceedings satisfy due process."[33] This test takes into account:

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probative value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[34]

In *Federal Deposit Insurance Corp. v. Mallen*,[35] the United States Supreme Court outlined three similar factors to consider in cases involving extended delay. These factors include "the importance of the private interest and the harm to this interest occasioned by delay[,] the justification offered by the Government for delay and its relation to the underlying governmental interest[,] and the likelihood that the interim decision may have been mistaken."[36] Because the *Mathews* and *Mallen* factors closely track each other, we will examine both together.

### 1. Private interest

The first factor raises the question whether there can be a deprivation of a property interest due to a deficiency in a proceeding where the applicant's claim is ultimately de-

---

**28.** AS 44.62.190 (requiring that the public be given notice of new regulations adopted by state agencies).

**29.** *See Wadsworth*, CFEC 75–465 (1990) (granting past participation points for 1972 under the unavoidable circumstances exception where the applicant had served in the military for part of the year, and ultimately granting the *Isakson* applicant a permit); *Uttley*, CFEC 75–807 (1984) (granting a permit to an *Isakson* applicant on the ground that, "had not circumstances beyond [Uttley's] control thwarted [his] intent to participate as a gear license holder in 1972, [his] earnings would have been sufficient to establish the requisite 90% dependence on the fishery"). The CFEC considered unavoidable circumstances in another *Isakson* case, but ultimately denied the applicant's request for a permit. *See Byford*, CFEC 75–610 (1986) (denying a permit to an *Isakson* applicant who claimed an exception under unavoidable and special circumstances).

**30.** *See, e.g.,* 20 AAC 05.600; 20 AAC 05.640.

**31.** *See, e.g., Kalmakoff*, 693 P.2d 844; *Templeton*, 598 P.2d 77; *Isakson*, 550 P.2d 359.

**32.** *State, Dep't of Health & Soc. Servs. v. Valley Hosp. Ass'n, Inc.*, 116 P.3d 580, 583 (Alaska 2005).

**33.** *Valley Hosp. Ass'n, Inc.*, 116 P.3d at 583 (citing *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)); *see also Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 242, 108 S.Ct. 1780, 100 L.Ed.2d 265 (1988).

**34.** *Valley Hosp. Ass'n, Inc.*, 116 P.3d at 583.

**35.** 486 U.S. at 242, 108 S.Ct. 1780.

**36.** *Id.*

nied. Although Brandal does not have a "private interest"[37] in receiving a permit to which he is not legally entitled, he clearly has an interest in being able to earn a livelihood. Just as importantly, all applicants—including those whose permit applications are ultimately denied—have a procedural interest in the prompt and fair adjudication of their claims. For this reason, although the original denial in 1978 and the recommended denial issued in 1982 both provided notice that Brandal could not rely on the eventual issuance of a permit,[38] Brandal did have a procedural interest in having his claim resolved.

### 2. Risk of error created by the delay

This factor strongly favors the CFEC. If Brandal had not received an interim permit, and if the final decision had been to grant his application, he would have a strong argument that the CFEC's delay created a serious "risk of an erroneous deprivation"[39] of his property interest, as it would have deprived him of twenty-two years of rightful access to the fishery. But the CFEC obviated this problem by issuing him an interim permit. The CFEC's grant of an interim permit may have been erroneous relative to the final decision, but the error resulted in a windfall for Brandal.

Furthermore, Brandal has not identified any aspect of the CFEC's procedure that is likely to create the risk of an inaccurate result. The CFEC's glacial pace endangered the timeliness of the decision, not the accuracy of the result. Although Brandal raises substantive objections to the CFEC's decision, these objections arise from a dispute about the meaning of the special circum-

stances provision, not a claim that the CFEC's factfinding process is fundamentally flawed.

### 3. Government interest and justification for the delay

The third factor clearly favors Brandal. Although he does not give a detailed account of the procedure that he would substitute for the present method of adjudicating applications, he does state that he would have experienced much less hardship "[h]ad CFEC promptly adjudicated and rejected his application." If the "additional or substitute procedural requirement"[40] suggested by Brandal is simply that the CFEC process applications promptly, the government has virtually no interest in avoiding this requirement. Although we recognize that the "fiscal and administrative burdens"[41] of adjudicating cases may affect the promptness of decisions, no conceivable burden could justify sitting on a simple permit application for over two decades.

CFEC's "justification ... for [the] delay and its relation to the underlying government interest"[42] is profoundly unpersuasive. The CFEC's claim that "[t]he time when Brandal's complete application record came before the Commission coincided with a time when the Commission was unable to devote sufficient time to its review" might excuse a delay of weeks or months, but not of decades. As the D.C. Circuit observed in the context of a far more complex administrative proceeding, "nine years should be enough time for any

37. *Valley Hosp. Ass'n, Inc.*, 116 P.3d at 583; *see also Mallen*, 486 U.S. at 242, 108 S.Ct. 1780 (directing courts to consider "the importance of the private interest and the harm to this interest occasioned by the delay").

38. Had CFEC officials led Brandal to believe that he was going to be awarded a permit, Brandal could argue that an interest was created by his reliance on these statements. It is unclear, however, if such reliance would be sufficient to create a property interest. *Cf. State, Dep't of Commerce & Econ. Dev., Div. of Ins. v. Schnell*, 8 P.3d 351, 358 (Alaska 2000) (considering, but ultimately rejecting, the argument of an insurance agent that statements by Division of Insurance

officials implying that disciplinary action would not be taken against him estopped the Division of Insurance from taking such action).

39. *Valley Hosp. Ass'n, Inc.*, 116 P.3d at 583. The equivalent factor in *Mallen* considers the "likelihood that the interim decision [which would be controlling during the delay] may have been mistaken." 486 U.S. at 242, 108 S.Ct. 1780.

40. *Mallen*, 486 U.S. at 242, 108 S.Ct. 1780; *Valley Hosp. Ass'n, Inc.*, 116 P.3d at 583.

41. *Valley Hosp. Ass'n, Inc.*, 116 P.3d at 583.

42. *Mallen*, 486 U.S. at 242, 108 S.Ct. 1780.

agency to decide almost any issue."[43] A permit application should take a fraction of that time.

The traditional remedy for such a delay, however, has generally been a court order compelling the agency to reach a decision.[44] At no point during the twenty-two years after 1982 did Brandal seek an order compelling the CFEC to reach a decision.

#### 4. Whether delay without prejudice can be a denial of due process

We have stated that delay can constitute a violation of due process in the criminal context, if it results in actual prejudice to the defendant,[45] and in certain civil contexts, if the delay causes the deprivation of a private interest.[46] But we have never held that delay alone, with no accompanying prejudice, constitutes a violation of the right to due process.[47]

The facts of the present case do not justify such a holding. The CFEC's handling of this case was inexcusable, and Brandal may experience significant harm, but the CFEC's delay is not the reason for Brandal's difficulties. Contrary to Brandal's claim that "[t]he delay caused him to become almost entirely economically dependent on the fishery and lulled him into not learning another occupation," Brandal had ample notice that the CFEC

was likely to reject his claim. In 1978 and 1982 hearing officers found that he lacked sufficient points to qualify for a permit. Brandal had no reason to assume that the cause of the delay was that his case was deemed exceptionally close: courts and administrative agencies often face exceptionally close cases, but they almost never sit on them for decades on end. Brandal elected not to learn another occupation in spite of having received notice that he was unlikely to be awarded a permit. Because the CFEC's delay did not prejudice Brandal, we hold that the delay did not constitute a violation of Brandal's right to due process.

#### E. Unreasonable Delay and Quasi–Estoppel

#### 1. Unreasonable delay

As the CFEC points out, none of the cases cited by Brandal supports the proposition that an administrative agency's decision can be overturned solely because the agency was slow in rendering its decision. Even if Brandal's assertion that a plaintiff can prevail on an unreasonable delay claim by "show[ing] unreasonable delay and prejudice" were accurate, he would be unable to make out a claim because he was not prejudiced by the delay. Had the CFEC adjudicated his case promptly, Brandal would not have received

**43.** *Nader v. F.C.C.*, 520 F.2d 182, 206 (D.C.Cir. 1975) (finding unreasonable delay where two issues were in their tenth year of consideration and ordering the FCC to resolve the issues promptly).

**44.** *See Cutler v. Hayes*, 818 F.2d 879, 895–96 n. 137 (1987) (providing a lengthy list of cases, including *Nader v. F.C.C.*, in which courts have "intervened to compel an agency unreasonably delaying to speed up its activities").

**45.** *See, e.g., Millman v. State*, 841 P.2d 190, 195 (Alaska 1992) (holding that "[t]he due process clauses of the United States and the Alaska Constitutions protect the accused against unreasonable pre-accusation delay[,] ... [b]ut to prevail on a claim of pre-accusation delay, the accused must establish both that the delay was unreasonable and that it actually prejudiced the accused's defense of the case").

**46.** *See, e.g., Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles*, 20 P.3d 1130, 1134 n. 4 (Alaska 2001) (holding that an eight-month

delay in a driver's license revocation hearing was not a violation of due process, but noting that it could have been if Whitesides had been deprived of his license in the interim); *see also United States v. $8,850 in United States Currency*, 461 U.S. 555, 564, 103 S.Ct. 2005, 76 L.Ed.2d 143 (1983) (holding that a delay in a civil forfeiture case where the claimant has been deprived of the property at issue can constitute a due process violation, and drawing an analogy between the right to due process in this context and the right to a speedy trial).

**47.** In *North Slope Borough v. Barraza*, we stated in dicta that a "delay of four months between [a post-termination] decision and the issuance of ... findings was not so unreasonable as to create an independent due process violation." 906 P.2d 1377, 1381 (Alaska 1995). But the former public employee alleging the due process violation claimed to have been deprived of her property interest in back pay for the full duration of the post-termination proceedings. *Barraza* did not hold that a due process violation can occur without any deprivation of life, liberty or property.

the windfall of being allowed to fish without being entitled to a permit.

## 2. Quasi-estoppel

█ Brandal's quasi-estoppel claim is also unpersuasive. Quasi-estoppel "precludes a party from taking a position inconsistent with the one he [or she] has previously taken where circumstances render assertion of the second position unconscionable." [48] But the CFEC has not changed its position. As shown by the 1978 ruling, the 1982 recommended decision, and the 2004 final decision, the CFEC has consistently maintained that Brandal does not qualify for a permit. Brandal has no inconsistent earlier statement to rely on, and so he has not made out a quasi-estoppel claim.

## IV. CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the superior court.

---

48. *Batey v. Batey,* 933 P.2d 551, 554 (Alaska 1997). *Cf. Wassink v. Hawkins,* 763 P.2d 971, 975 (Alaska 1988) ("Estoppel may be invoked as a defense against the government where four elements are present: (1) the governmental body asserts a position by conduct or words; (2) the person acts in reasonable reliance thereon; (3) the person suffers resulting prejudice; and (4) the estoppel serves the interest of justice so as to limit public injury.").