**Bert E. MAY, Appellant,**

v.

**STATE of Alaska, COMMERCIAL FISHERIES ENTRY COMMISSION, Appellee.**

**No. S–12267.**

Supreme Court of Alaska.

Oct. 12, 2007.

15.  *Id.*

16.  *Id.*

17.  *Id.*

Michael W. Holman, Ketchikan, for Appellant.

Vanessa Lamantia, Assistant Attorney General, and David W. Márquez, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Bert May appeals the denial of a limited entry permit to enter the Southeast Alaska herring purse seine fishery. May's application, which has been pending since 1977, was denied because May did not participate in the geographically-defined fishery in the years preceding his application. May received notice in 1977 that his fishing in the waters of Annette Island Reserve (AIR) did not qualify him for the fishery because AIR waters were not part of the defined limited fishery, a determination which an administrative hearing officer affirmed in a written decision almost twenty five years later, and which the Commercial Fisheries Entry Commission's (CFEC or the commission) Final Decision likewise affirmed. The superior court subsequently affirmed the CFEC Final Decision in all respects.

Rather than argue that he is eligible to apply for a permit and receive participation points under the applicable regulations, May argues through a variety of legal theories that the commission should grant him an entry permit because it (erroneously) gave participation points to another applicant for Annette Island Reserve fishing activity. Because the doctrines that May relies upon, including collateral estoppel, stare decisis, and due process, do not require that we perpetuate an erroneous decision in clear contravention of the applicable statutes and regulations, we affirm the CFEC Final Decision. May additionally appeals the superior court's award of attorney's fees. Because there was no error in the award of attorney's fees, we affirm that decision.

## II. FACTS AND PROCEEDINGS

The Alaska Legislature enacted the Limited Entry Act[1] in 1973 in order to "promote the conservation and sustained yield management of Alaska's fishery resources and the economic health and stability of commercial fishing in Alaska."[2] In 1977 the Alaska Commercial Fisheries Entry Commission, the agency tasked with implementing limited entry, limited access to the Southeast roe herring purse seine fishery.[3] According to a 1985 CFEC memorandum on the subject, initially the commission wanted to limit only the sac roe herring fishery, but not the fishery for bait or food herring.[4] It believed its only statutory authority to separate the winter bait and food fishery from the sac roe fishery lay in its authority to establish administrative areas. Thus, the commission divided Southeast into two areas, A–1, which included the area in which it believed herring to spawn, and A–2, which included the rest of the Southeast. Under the regulations, the only area in the Southeast to receive a designation requiring limited entry for herring seining was A–1.[5] The commission decided to

---

1. AS 16.43.010–.990 (1973).

2. AS 16.43.010(a).

3. The regulations identify the fishery under the subheading "Herring fisheries" and labeled it "Specific Southeastern Alaska Area (A–1) purse seine fishery." 20 AAC 05.310(a), am. 2/25/77, Register 61. Variations on the fishery's name proliferate, most omitting the word "specific" and adding the words "sac roe" or "roe" be-

cause that was the type of herring fishing that the CFEC was attempting to limit.

4. Memorandum from Judy Brakel, Fisheries Coordinator, CFEC, History of CFEC Regulatory Changes Affecting Southeast and Prince William Sound Herring Administrative Areas (April 24, 1985).

5. 20 AAC 05.320 (1977), am. 2/25/77, Register 61.

issue thirty five permits for that fishery.[6]

In order to prioritize among the applicants, the CFEC awarded points based on investment in a vessel and gear, availability of alternative occupations,[7] and participation in the fishery during the years 1974–1976.[8] In addition, to be *eligible* to apply for a permit, an applicant must have harvested the resource of the fishery during that time with proper licenses or interim-use permits.[9] Six points proved necessary for award of a limited entry permit.[10]

Bert May applied for a permit to enter the Southeast purse seine herring fishery on March 4, 1977. May sought a total of eight points: two for past participation in 1976, two for past participation in 1975, one for availability of alternative occupations, one for investment in a vessel, and two for investment in a herring purse seine. Eleven years later May added the claim that he had participated in the fishery in 1974, for which he sought an additional participation point. May, a member of the Metlakatla Indian Community, had fished the waters around Annette Island Reserve [11] (AIR) during 1975–1976. Those waters were outside state control and no state permit or license was necessary to fish there. However, May attempted to qualify for the herring fishery on the basis of his AIR activity.

On April 8, 1977, the CFEC sent May a letter notifying him that because he only herring seined in AIR waters, he was ineligible to apply for the entry permit. The CFEC subsequently told May's attorney that the reason for the denial was because May did not participate in the herring fishery in northern Southeast Alaska (the area referred to as A–1 in the regulations).

In a subsequent telephonic discussion May's attorney apparently persuaded a CFEC hearing examiner that the lack of *eligibility* requirements in the regulations meant that May was eligible to apply for a permit. The hearing examiner verbally stated that although May was still not qualified to earn participation points for fishing in AIR waters, he would send May notice reversing the April 8 determination of ineligibility to apply. It is not clear from the record whether the examiner realized at the time that while the regulations were silent on eligibility requirements, AS 16.43.260(a) specified that the commission could only accept applications from individuals who had previously harvested *"in the fishery."* (Emphasis added.) Regardless, on May 25, 1977, the CFEC informed May that its initial determination declining to accept his application was correct pursuant to the relevant statutes in conjunction with the regulations.

In April 1978 the commission wrote to May and informed him that his application was still pending and invited him to submit additional evidence. May responded with an explanation of his claim and an offer of proof that was supported by evidence submitted by him the previous year. In his letter May asked to "re-apply" for a Southeastern herring purse seine permit. May explained that he had purchased sonar and invested in more gear in 1976 with full confidence that his past participation would entitle him to a limited entry permit. The commission did not respond and the issue of May's permit lay

6. *Id.*

7. The CFEC awards the point to applicants who, based on their domicile, have fewer alternative occupations available to them. 20 AAC 05.620(3)(1977).

8. 20 AAC 05.662 (1977). Under the regulations a total of nine points could be awarded in area A–1: two points for past participation in 1976, two points for past participation in 1975, one point for past participation in 1974, three points for investment in vessel and gear (one point for owning a purse seine vessel, two points for owning a herring purse seine), and one point if the alternative occupations in the location of the applicant's domicile are lacking, as determined by population. 20 AAC 05.664(a)(1), (b)(1)-(2)(1977).

9. AS 16.43.260. Eligibility to apply is governed by statute and not the regulations, leading to apparent confusion within the CFEC in the early years of this case.

10. *See* 20 AAC 05.666(1), am. 2/25/77, Register 61.

11. Annette Island Reserve is sometimes incorrectly referred to as the Metlakatla Indian Reservation in CFEC documents.

dormant for the next six years.[12] While May's case was pending he was able to participate in the fishery.

In June 1984 May requested that the CFEC reopen his case. The CFEC responded that it would make a decision on whether or not to accept May's permit application based upon the possibility that administrative error occurred when it was originally denied. The letter indicated that the decision to accept May's application for processing was a decision that would be made prior to a determination of whether or not May had enough points to qualify for a permit.

In January 1985 the commission remanded the application to the adjudication section of the CFEC "for a determination as to Mr. May's eligibility to apply for his Southeastern herring purse seine entry permit." This remand notice, which was copied to May, detailed the procedural history of May's case and requested that the adjudication section not foreclose May's application on procedural grounds. The notice also spelled out some of the relevant statutory and regulatory background and stated that "the effect of Commission decision [*Clement* [13]] is that fishing in Metlakatla waters ... should be credited to an applicant, unless our regulations by their terms preclude doing so." The letter also asked the adjudication section to "look critically at Mr. May's claim, in case the commission has overlooked some aspect of this record" and stated both at the beginning and end of the two-page notice that the adjudication staff should make a determination of May's eligibility.

On April 24, 1985, the adjudication section of the CFEC informed May that he was ineligible to apply because he had not "actively harvest[ed] the fishery resource in area A–1." The CFEC wrote that "[t]he regulations in place at the time of entry limitation specifically excluded the waters around Annette island." The CFEC explained that

AIR waters fell outside the concretely defined 1977 boundaries of area A–1.

May timely requested an administrative hearing, which the commission granted. The hearing was initially scheduled for February 1986 and postponed to May 1986 at the request of May's attorney. The administrative hearing was conducted before Hearing Officer David Ingram, and May was the only witness. May testified that he purse seined for herring in AIR waters in 1974–1976 and that he attempted to purse seine for herring in Behm Canal during 1974 with what he believed were the proper permits and licenses, though he could not find them at that date. Hearing Officer Ingram left the record open for additional evidence. May submitted four affidavits over the next two months supporting his testimony. One from Harvey Leask stated that May had leased an eighty-five fathom herring purse seine from him in 1974 and purchased it in 1975. May submitted an affidavit attesting to his purchase of a sonar unit in spring 1976. May also submitted affidavits from Frank Hayward and Ronald Porter which attested to May's participation in the sac roe herring purse seine fishery in 1974 in North Behm Canal,[14] and which also spoke to May's good character and reliance on Annette Island Packing Company for proper licensing. In December 1988 May requested an extension of time to submit more evidence. None was submitted for the next nine years.

In April 1993 May's then-attorney, Brad Brinkman, informed the CFEC that he was leaving on a one-year sabbatical and that Doug Rickey would represent May in Brinkman's absence. In July 1997 Hearing Officer Ingram informed May that Brinkman had left private practice and that the record in his case would close on July 29, 1997. May's new attorney, Daniel Bruce, filed a memorandum in support of the application which argued that May should receive participation

---

12. Nothing in the record justifies the long periods of delay and dormancy that occurred, though it appears that the CFEC allowed May to pursue his case even though it may have been time-barred. The due process consequences of the delay are discussed below in Part IV.A.6.

13. CFEC 75–421 (1982).

14. In 1974 North Behm Canal was a fishery in Southeast that was not defined as part of area A–1 but was instead a regulated fishery designated as (1)(E). May did not address on appeal what relevance his fishing in Behm Canal has on his eligibility to apply for an A–1 fishery permit.

points for 1974 on the basis of the previously-filed affidavits.

On December 31, 2002, Hearing Officer Ingram issued a decision concluding that May was ineligible to apply for the permit, and that even if May had proven his eligibility to apply, his claims for points for alternative occupations and vessel/gear investments would fail for lack of proof. The hearing officer also determined that May was not entitled to participation points for fishing activity in AIR waters. He noted that his decision that AIR waters did not qualify May for participation points was at odds with an earlier CFEC decision in *Leask*,[15] but explained that *Leask* was improperly decided.

May filed a petition for administrative review with the CFEC and mentioned *Leask*[16] and *Clement*.[17] May argued that the hearing officer's refusal to award May points violated his rights to equal access and equal protection and was discriminatory. In December 2004 the CFEC issued a decision (CFEC Final Decision) denying the petition for administrative review, affirming the hearing officer's decision that May was ineligible to apply, and modifying the hearing officer's decision to the extent that, had May been found eligible to apply, he would have been awarded four points. Those points would have been for investment in vessel and gear and for availability of alternative occupations.[18] This decision left May ineligible to apply for a permit and, if later found eligible, in need of two participation points. May appealed to the superior court on the issues of his eligibility to apply for a permit and his entitlement to participation points for 1974 through 1976, emphasizing that his application received a different outcome than *Leask*.

Superior Court Judge Trevor N. Stevens heard oral argument in May's case in October 2005. In March 2006 Judge Stevens affirmed the CFEC Final Decision on all points on appeal.

The superior court awarded the CFEC attorney's fees in the amount of $4,532.50, which represented twenty percent of the actual fees incurred. The superior court noted that May had "litigated in good faith and pursued non-frivolous claims," and awarded the partial fee award in light of five findings: (1) CFEC prevailed on appeal; (2) May did not claim that the fees were unreasonable or not reasonably incurred; (3) CFEC's billings and records reflected that the hourly rate was reasonable, the fees were incurred with respect to the appeal, and the fees were reasonably incurred; (4) CFEC necessarily expended considerable effort on the appeal and prevailed but did not recover a money judgment; and (5) May's argument that the equities favor his position was not supported by the record.

May appeals.

## III. STANDARD OF REVIEW

[1, 2] When the superior court acts as an intermediate court of appeal from an agency decision, we directly review the agency determination.[19] We apply four standards of review to administrative decisions:

> (1) the substantial evidence test for questions of fact; (2) the reasonable basis test for questions of law involving agency expertise; (3) the substitution of judgment test for questions of law where no expertise is involved; and (4) the reasonable and not arbitrary test for review of administrative regulations. [20]

[3–5] We apply our "independent judgment to a due process claim because it raises a question of law that does not involve agency expertise."[21] Additionally, "[t]he applicability of collateral estoppel to a particular set of facts is a question of law subject to independent review."[22] "Where . . . the question

15. CFEC 75–422 (1985).

16. *Id.*

17. CFEC 75–421 (1982).

18. These points are not on appeal now.

19. *Brandal v. State, Commercial Fisheries Entry Comm'n*, 128 P.3d 732, 735 (Alaska 2006).

20. *Id.*

21. *AU Int'l, Inc. v. State, Dep't. of Natural Res.*, 971 P.2d 1034, 1040 (Alaska 1999).

22. *State v. United Cook Inlet Drift Ass'n*, 895 P.2d 947, 950 (Alaska 1995).

is as to the merits of agency action on matters committed to agency discretion, our scope of review is limited to whether the decision was arbitrary, unreasonable or an abuse of discretion."[23]

Attorney's fee awards are reviewed for an abuse of discretion and overturned only when the superior court's award was "manifestly unreasonable."[24]

## IV. DISCUSSION

May does not expressly appeal the finding of ineligibility to apply for a permit, despite including it as his first point on appeal. The superior court found that he waived his appeal on this. While we could conceivably find likewise, and end the inquiry into May's entitlement to a permit on this point, we will address the issue because May's eligibility to apply is closely tied to the issue of whether or not credit should be given for fishing in Annette Island Reserve (AIR) waters—a topic which May discusses extensively. May organizes most of his arguments under his appeal for participation points for 1976, and he briefly addresses his participation point claims for 1975 and 1974. We address the issue of May's eligibility as it pertains to 1974–1976.

### A. The CFEC Did Not Err in Concluding that May Was Not Eligible To Apply for a Permit.

#### 1. May is not eligible to apply for a permit based on fishing in AIR waters.

■ Eligibility to apply for a permit to enter a controlled fishery is governed by AS 16.43.260(a). That statute states:

The commission shall accept applications for entry permits only from applicants who have harvested [25] fishery resources commercially while participating in the fishery as holders of gear licenses ... or interim-use permits ... before the qualification date....

"Fishery" is defined quite specifically by the statute: "Fishery means the commercial taking of a specific fishery resource in a specific administrative area with a specific type of gear."[26] Thus, the Southeast herring purse seine fishery is defined by location, type of fish, and type of gear used.[27] Eligibility to apply for a permit for the fishery therefore hinges on the fisher having previously fished in the defined area, for herring, using a purse seine, with the proper license and permit.

Regulation 20 AAC 05.310 limited entry in three herring fisheries. The first was described as "Specific Southeastern Alaska Area (A–1) purse seine fishery." The regulations defined area A–1 as:

all waters of Lynn Canal north of the latitude of Shrine of St. T[h]erese and south of the latitude of Sherman Rock, excluding all waters of Berner's Bay within a line from Pt. St. Mary to Pt. Bridget, and

all waters of Seymour Canal north of 57° 37' N. lat., and

all waters of and adjacent to the Pacific Ocean south of the latitude of Neva Point and north of a line projected southwest of Cape Ommaney and west of Baranof Island.[28]

---

**23.** *N. Slope Borough v. LeResche,* 581 P.2d 1112, 1115 (Alaska 1978).

**24.** *Palfy v. Rice,* 473 P.2d 606, 613 (Alaska 1970).

**25.** The reference to harvesting is more stringent than the requirement for participation points defined in 20 AAC 05.664 (1977), which awards points for the herring fisheries when individuals are present "on the fishing grounds with the appropriate vessel, gear, licenses, and interim-use permit with the intention of taking the herring resource during the time the season was open and the herring resource was harvested." In contrast, harvesting requires "obtaining physi-

cal control [of the herring resource] for the purposes of commercial disposition." *Estate of Lewis v. State, CFEC,* 892 P.2d 175, 181 (Alaska 1995).

**26.** AS 16.43.990(4), *formerly* AS 16.43.380(3).

**27.** AS 16.43.990(5), *formerly* AS 16.43.380(4) defines gear as "the specific apparatus used in the commercial harvest of a species, including but not limited to purse seines, drift gill nets, set gill nets, and troll gear."

**28.** 20 AAC 05.230(a)(3)(B), am. 2/25/77, Register 61.

May's primary eligibility problem[29] is his failure to have fished within the specific geographical area that defines the fishery. May based his application on a history of purse seining in AIR waters. But *May makes no argument that the waters of Annette Island Reserve fall within the boundaries of area A–1.* He also makes no argument that the regulations, by their terms, suggest that eligibility points or participation for the A–1 fishery can be earned for fishing conducted in an area outside of A–1. Hearing Officer Ingram noted that "almost the entire area of Southeast Alaska was excluded from consideration in the purse seine system, including the waters around the Annette Islands Reserve and those in North Behm Canal. Only three small, discrete areas were included." Thus, according to the regulations in place at the time May applied for a permit, May is ineligible to apply for a limited entry permit based on his fishing in AIR waters.

May's most oft-repeated argument in favor of his eligibility is based on the fact that in *Leask*[30] the CFEC granted participation points to an applicant who attempted to fish in AIR waters. In *Leask* the CFEC held that the hearing officer had erroneously denied credit to Harvey Leask, an applicant for the roe herring purse seine fishery, for attempting to fish in AIR waters in 1976. The CFEC concluded that Leask deserved points for AIR participation based on *Clement,*[31] which gave participation points for AIR fishing in 1975 towards a limited entry permit in the herring gill net fishery.[32] As Hearing Officer Ingram pointed out below, however, the herring gill net fishery at issue in *Clement* operated under different regulations and involved a point system that was "remarkably different" from the roe herring purse

seine fishery. Under regulations promulgated in 1978, the herring gill net fishery awarded participation points for qualified activity within any part of area A for the years 1972–1975, and gave points based on participation in sub-areas of A (including an "other" section) in 1976 and 1977.[33] While area A by definition included AIR waters,[34] the sub-areas used for the later years explicitly excluded AIR waters by not mentioning it as a sub-area and defining "other" as "all portions of administrative area A not included above, excluding the waters of Metlakatla Indian Reservation."[35] In *Clement* the applicant received credit for fishing in AIR waters in 1975 only.[36]

Unlike the herring gill net fishery, the roe herring purse seine fishery specifically defined area A–1 in such a way that plainly excluded AIR, making any additional mention of AIR superfluous. The CFEC in *Leask* apparently did not realize this distinction and read *Clement* as controlling in the roe herring purse seine context, holding that it "authorizes an award of points for past participation in the waters of the Metlakatla Indian Reservation, unless such an award is precluded by the terms of Commission regulations.... [T]here is no such exclusion in Commission regulations governing the Southeastern roe herring purse seine fishery."[37] However, the CFEC recognized its *Leask* error in subsequent cases and Hearing Officer Ingram explained that *Leask* must be overruled because it was inconsistent with the regulations. The CFEC Final Decision wholly affirmed the hearing officer's conclusions in this regard, adding that *Clement* was probably wrongly decided even for the gill net fishery insomuch as the later regulations meant to clarify the agency's intent all along,

---

**29.** In 1974 May also lacked the required license and interim use permit, and did not successfully harvest any fish.

**30.** CFEC 75–422 (1985).

**31.** CFEC 75–421 (1982).

**32.** *Id.*

**33.** 20 AAC 05.668 (1978).

**34.** Area A included "all waters between the longitude of Cape Fairweather and the International Boundary at Dixon Entrance." 20 AAC

05.230(a)(1)(A) (1978). The Annette Island Reserve lies south of Cape Fairweather and north of the boundary at Dixon entrance.

**35.** 20 AAC 05.668(5) (1978). As noted above, the CFEC sometimes referred to Annette Island Reserve as Metlakatla Indian Reservation.

**36.** Clement had also sought credit for AIR water fishing for 1976 and 1977. CFEC 75–421 (1982).

**37.** *Leask,* CFEC 75–422 (1985).

which was never to award participation credit for fishing in AIR waters. The CFEC Final Decision also noted that May's case is distinguishable for the additional reason that May's *eligibility* to apply hinges on AIR water harvesting, whereas *Leask* and *Clement* were only concerned with participation points for applicants who were already eligible to apply.[38] The superior court likewise held that *Leask* was wrongly decided and that the regulations applicable to May excluded AIR waters.

The reasonable basis standard of review applies to the agency's interpretation of statutes within its area of expertise and to the interpretation of its own regulations.[39] Because the CFEC clearly had a reasonable basis to conclude that its regulations defining the A–1 area do not include AIR waters, and because *Leask* was wrongly decided when it awarded participation points for activity in AIR waters, we affirm the CFEC's finding that May was not eligible to apply for a permit based on his AIR fishing. Rather than argue the merits of his eligibility or the merits of the initial *Leask* decision, May spent the lion's share of his brief arguing variations on the theme that the CFEC should be bound to its decision in *Leask* regardless of its lack of foundation in the law.[40] Taken together those arguments can be generally answered with a statement that we have adopted from Judge Friendly: "The making of an error in one case ... gives

other[s] ... no right to its perpetuation." [41] We address May's specific arguments below.

## 2. The CFEC was not collaterally estopped from denying credit for AIR claims by its decision in *Leask*.

■ May relies on *State v. United Cook Inlet Drift Association*[42] for the proposition that the CFEC was collaterally estopped from denying May's claim because of its earlier decision in *Leask*. In *Cook Inlet* we defined three requirements for the application of collateral estoppel:

(1) The plea of collateral estoppel must be asserted against a party or one in privity with a party to the first action;

(2) The issue to be precluded from relitigation by operation of the doctrine must be identical to that decided in the first action;

(3) The issue in the first action must have been resolved by a final judgment on the merits.[43]

We also adopted a limited exception to the application of collateral estoppel against the state on "unmixed questions of law." [44] We recognized that the state "should be permitted to relitigate an issue if it 'is one of law and treating it as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule upon which it was based.' " [45] As May notes, *Cook Inlet's* exception to collateral estoppel

---

**38.** As previously discussed, eligibility requirements to apply for a permit in the roe herring purse seine fishery are more stringent than the requirements for award of past participation points. *Lewis v. State, Commercial Fisheries Entry Comm'n*, 892 P.2d 175, 180–81 (Alaska 1995).

**39.** *Brandal v. State, Commercial Fisheries Entry Comm'n*, 128 P.3d 732, 735 (Alaska 2006).

**40.** May largely ignores the merits of the *Leask* decision. May does note that during the year *Leask* was decided, the definition of A–1 was not included in the regulations although the designation of A–1 was still used. May suggests that the absence of the definition of A–1 in the regulations may have been the most likely explanation for the *Leask* decision. This explanation does not support upholding *Leask* as binding law, however, because it would be a further indication that *Leask* was decided erroneously on the basis of a clerical error or lack of proper research by the CFEC at the time that it issued the decision.

May argues that because the CFEC did not overturn *Leask* on the explicit basis of an error regarding the regulatory history, this court should presume that the CFEC knew what it was doing in *Leask* and for that reason *Leask* should be upheld. May does not attempt to justify *Leask* on the merits; rather, he urges us to uphold *Leask* based on secondary considerations.

**41.** *Silides v. Thomas*, 559 P.2d 80, 89 (Alaska 1977) (quoting *Sirbo Holdings, Inc. v. Comm'r*, 509 F.2d 1220, 1222 (2d Cir.1975)).

**42.** 895 P.2d 947 (Alaska 1995).

**43.** *Id.* at 950–51 (citing *Murray v. Feight*, 741 P.2d 1148, 1153 (Alaska 1987)).

**44.** *Id.* at 952.

**45.** *Id.* (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 29(7) (1982)).

"only applies where the two cases involve unrelated subject matter."[46] Here the subject matter between *Leask* and *May* is largely related.

However, *Cook Inlet* is distinguishable from the present case because *Cook Inlet* did not address the unique position of the state when it acts in a quasi-judicial role. There the state was sued in two related actions regarding the constitutionality of its "all-Alaskan" policy which, in eliminating the preference to rural residents that we had earlier found to be unconstitutional, granted subsistence rights to all Alaskans.[47] In *Cook Inlet* the state acted in the role of law-maker, rather than adjudicator. In the instant case, the CFEC did not issue a new regulation whose merits were ruled upon by another court, but instead rendered an erroneous decision and opted not to perpetuate its error when faced with similar facts in a different case.

■ The superior court held that under Alaska law the doctrine of collateral estoppel does not apply to a judicial body. The state supports the superior court's position with three cases from other jurisdictions in which claims of estoppel against an agency were rejected.[48] While we have never directly addressed this issue before, we agree with the superior court and the state that an assertion of collateral estoppel against an agency acting in a quasi-judicial capacity is inappropriate, particularly in cases where, as here, the agency is correcting its prior action in order to conform to the law.

The Supreme Court has recognized that an agency may "flatly repudiate" previously devised norms that "are no longer required in order to effectuate congressional policy," provided that the agency explain its departure.[49] Once the departure from precedent is explained, the reviewing court "is limited to [determining] whether the rationale is so unreasonable as to be arbitrary and capricious."[50] May appears to embrace this standard of review in part, because he cites similar cases under his due process argument. May cites *Ramaprakash v. F.A.A.*[51] for the proposition that

> agency action is arbitrary and capricious if it departs from agency precedent *without explanation*. Agencies are free to change course as their expertise and experience may suggest or require, but when they do so they must provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.[52]

(Emphasis added.)

But May never alleges that the CFEC failed to explain that its *Leask* decision was being overturned. Indeed, both the hearing officer's decision and the CFEC Final Decision explicitly addressed *Leask* in detail and expressed reasons for overturning it. Because applying collateral estoppel here would violate the flexibility that courts have traditionally given agencies to correct errors in order to properly implement policy, we decline to apply it in this case.

### 3. The doctrine of stare decisis does not require that *Leask* control.

May argues that the doctrine of stare decisis binds the CFEC to follow the *Leask*

---

46. *Id.* at 953–54 (quoting *Montana v. United States*, 440 U.S. 147, 162, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979)).

47. *Id.* at 948.

48. *McQuerry v. U.S. Parole Comm'n*, 961 F.2d 842, 846 (9th Cir.1992) (parole commission not estopped from reopening case and revoking "street time credit" where commission's practice of giving credit had been based on a mistake of law); *Amarillo Prod. Credit Ass'n v. Farm Credit Admin.*, 887 F.2d 507, 512–13 (5th Cir.1989) (Farm Credit Administration "cannot be estopped from acting in accordance with the law" and "in light of reconsideration of the relevant facts and its mandate ... may alter its past

interpretation"); *N.L.R.B. v. T.W. Phillips Gas & Oil Co.*, 141 F.2d 304, 305–06 (3d Cir.1944) ("doctrine of estoppel may not be invoked against the Board so long as it is acting in its administrative or judicial capacity").

49. *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808, 93 S.Ct. 2367, 37 L.Ed.2d 350 (1973).

50. *Michigan v. Thomas*, 805 F.2d 176, 184 (6th Cir.1986).

51. 346 F.3d 1121 (D.C.Cir.2003).

52. *Id.* at 1124 (quotations omitted).

precedent in his case. This argument presents a question of law unrelated to agency expertise and thus we apply our independent judgment.[53] When confronted with stare decisis, we have held that "we will overrule a prior decision only when clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent."[54] The superior court noted that May failed to provide any legal authority to support the proposition that stare decisis applies to administrative agencies.

■ We agree with the superior court that consistent with Alaska law [55] and decisions of the United States Supreme Court,[56] agencies may overrule a prior decision if convinced it was wrongly decided. When overruling a prior decision, the agency must provide a reasoned analysis that explains why the change is being made. Moreover, it may not act in an arbitrary, unreasonable, or discriminatory fashion. In this case, as the superior court noted, "both the hearing officer's decision and the CFEC's Final Decision demonstrate that *Leask* was being deliberately overruled and not simply casually ignored."

May cites to our explanation of "law of the case" in *State, Commercial Fisheries Commission v. Carlson*[57] for a definition of the standards for stare decisis. However, law of the case is distinct from stare decisis because law of the case refers specifically to the binding effect of a prior holding in a "former

appeal *of a case*," [58] whereas stare decisis refers to the doctrine of precedent deriving from earlier judicial decisions.[59] For this reason, May's use of law of the case is inapposite here.

We conclude that the CFEC decision to overturn *Leask* satisfies the criteria necessary to overcome an agency's obligations under stare decisis.

### 4. The different treatment of May and Leask does not violate May's right to equal protection.

■ May argues that his right to equal protection [60] is violated by the CFEC Final Decision because he is not being treated in the same manner as the applicant in *Leask*. May's claim fails because he has not shown intentional discrimination. We have held that "[w]hen faced with a claim of unequal enforcement of civil laws, we think it appropriate that the claimant ... [show] 'an element of intentional or purposeful discrimination.'"[61]

May never even alleges an element of intentional or purposeful discrimination. The closest he comes is simply labeling the difference in treatment "discrimination." But the superior court held that the record did not reflect that the hearing officer or the CFEC intended to discriminate against May. And contrary to May's argument that the cases were handled differently "for no good reason," both the hearing officer and the CFEC

**53.** *See, e.g., Brandal v. State, CFEC*, 128 P.3d 732, 735 (Alaska 2006).

**54.** *State, Commercial Fisheries Entry Comm'n v. Carlson*, 65 P.3d 851, 859 (Alaska 2003) (internal quotation omitted).

**55.** *See Chocknok v. State, Commercial Fisheries Entry Comm'n*, 696 P.2d 669, 676 n. 10 (Alaska 1985) (holding that CFEC has discretionary power to correct a policy through adjudicatory determinations).

**56.** *See, e.g., Am. Trucking Ass'n, Inc. v. Atchison, Topeka & Santa Fe Ry. Co.*, 387 U.S. 397, 416, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967) ("[Regulatory agencies] are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.").

**57.** 65 P.3d at 859.

**58.** BLACK's LAW DICTIONARY 903 (8th ed.2004) (emphasis added).

**59.** *State v. Semancik*, 99 P.3d 538, 540 (Alaska 2004).

**60.** May also discusses, without citation, "equal access," which may refer to the Uniform Application Clause of Article VIII § 17 of the Alaska Constitution. However, he never makes any argument using either "equal access" or "uniform application" and thus we do not address the points here. *See Great Divide Ins. Co. v. Carpenter ex rel. Reed*, 79 P.3d 599, 608 (Alaska 2003) (noting that where party fails to adequately brief issue, it will be considered waived).

**61.** *Silides v. Thomas*, 559 P.2d 80, 88–89 (Alaska 1977) (quoting *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944)).

gave clear reasons why May's case was handled differently from Leask's.

Because of the absence of any allegations of intentional or purposeful discrimination, and because sufficient reasons showed why May's case was resolved differently then Leask's case, May's equal protection claim fails.

### 5. The different treatment of May and Leask does not violate May's right to be free from "unjust discrimination."

■ May presents the argument that he suffered from unjust discrimination in violation of AS 16.43.010(a) [62] in one paragraph of a forty-three page brief, and we therefore consider it waived.[63] Moreover, May's allegation that the commission has said "nothing to justify its discrimination between Mr. May and Mr. Leask" is plainly false. In fact, the commission admitted to a mistake in *Leask* and adequately explained its rationale for its reversal. May has not been discriminated against; he is being treated similarly to all other persons properly denied limited entry permits for which they are not eligible.

### 6. The CFEC did not violate May's due process rights.

■ May alleges that the CFEC violated his right to due process.[64] To the extent that May's due process complaint is about the merits of his fishery claim and the differential treatment, we addressed the merits of the decision above and have determined that the agency decision was not arbitrary, unreasonable, or an abuse of discretion.

May's remaining due process complaints are procedural. He argues that due process was violated in 1985 when the adjudication staff found him ineligible to apply for a permit following a remand notice from the CFEC. May treats the remand as an "order" and suggests that the adjudication staff exceeded its authority when it continued to research the eligibility implications of fishing in AIR waters. May expounds upon this in his reply brief, calling the remand from the CFEC to its adjudication section a "final decision" whose reversal "twenty years later" was "patently prejudicial." In point of fact, May was notified only three months after the remand that the adjudication section was again denying his claim. The denial was based on the same grounds—ineligibility—upon which his claim was denied in 1977; that denial was subsequently affirmed by the hearing officer's decision, the CFEC's Final Decision, and the superior court. Moreover, a reading of the remand notice makes it abundantly clear that May's eligibility to apply for a permit had not been decided. The first two sentences read:

> We remand this application to the adjudication section for a determination as to Mr. May's eligibility to apply for his Southeastern herring purse seine entry permit. If the determination is negative, Mr. May should be notified and given an opportunity for a hearing.

The remand notice likewise concludes, "we would appreciate adjudication staff examining this file, making a determination of Mr. May's eligibility with appropriate notice to the applicant." While the CFEC did explain in its remand that "it appears to us that Mr. May has made a prima facie case for his eligibility," it also said in the very next sentence "[a]t the same time, we would like the adjudication staff to look critically at Mr. May's claim, in case the commission has overlooked some aspect of this record." Reading the remand as a whole, we find May's claim of a resulting due process violation to be entirely without merit.

May also claims due process violations with regard to the four points that the hear-

---

**62.** Under AS 16.43.010(a) the CFEC is to control the "entry of participants and vessels into the commercial fisheries in the public interest and without unjust discrimination."

**63.** *Carpenter,* 79 P.3d at 608 n. 10 ("Points that are inadequately briefed are considered waived.").

**64.** Article I, section 7 of the Alaska Constitution provides, in part: "No person shall be deprived of life, liberty, or property, without due process of law." The Fourteenth Amendment to the United States Constitution provides, in part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1.

ing officer denied which the CFEC's Final Decision later chose to award to him. May's complaints with regard to these points are moot because the award of those points is not on appeal here.[65]

▮ Finally, May makes roundabout complaints pertaining to the length of the delay in this case. Only one sentence, unsupported by any citation to case law, speaks to the issue directly: "On the other hand, the nearly twenty years it took for the agency to finally announce its decision on this issue should be considered unreasonable and an abuse of discretion per se." This briefing is so inadequate that we find this argument waived.

▮ Moreover, even if the argument was not waived, May's claim fails under our holding in *Brandal v. State, Commercial Fisheries Entry Commission.*[66] In *Brandal* we held that a twenty-two year delay in a CFEC decision did not violate the applicant's due process rights.[67] After noting that during the years in which the case was pending Brandal received an interim permit allowing him to participate in the fishery, we stated:

> [W]e have never held that delay alone, with no accompanying prejudice, constitutes a violation of the right to due process. The facts of the present case do not justify such a holding. The CFEC's handling of this case was inexcusable, and Brandal may experience significant harm, but the CFEC's delay is not the reason for Brandal's difficulties. Contrary to Brandal's claim that "[t]he delay caused him to become almost entirely economically dependent on the fishery and lulled him into not learning another occupation," Brandal had ample notice that the CFEC was likely to reject his claim. In 1978 and 1982 hearing officers found that he lacked sufficient points to qualify for a permit.... Brandal elected not to learn another occu-

pation in spite of having received notice that he was unlikely to be awarded a permit. Because the CFEC's delay did not prejudice Brandal, we hold that the delay did not constitute a violation of Brandal's right to due process.[68]

May's situation is very similar to *Brandal* in that he also received interim-use permits resulting in the same windfall of twenty years of access to a fishery in which he was not entitled to fish. This fact mitigated any prejudice that the otherwise unreasonable delay may have had on May. Moreover, May does not articulate *any* theory of reliance or prejudice. While May argues that he might have relied on *Leask* "once he found out about it," he separately acknowledges that *Leask* was first addressed in the record in the hearing officer's decision in 2002. The fact that May cannot now continue to utilize a permit to which he was never entitled is not a violation of due process.

## B. The Superior Court Did Not Abuse Its Discretion in Its Award of Partial Attorney's Fees to the CFEC.

▮ May asks that we reverse the superior court's award of partial attorney's fees. Alaska Appellate Rule 508(e) governs the superior court's application of attorney's fees in this case and provides in part that "[a]ttorney's fees may be allowed in an amount to be determined by the court." The superior court looked to Alaska Civil Rule 82 as a guideline for calculating reasonable partial attorney's fees, a practice which we have previously approved.[69] Rule 82(b)(2) provides that in cases which are resolved without trial and in which the prevailing party receives no money judgment, twenty percent of actual attorney's fees necessarily incurred is the appropriate award. Rule 82 also allows the court to vary the fee depending on a number of factors including vexatious or bad faith conduct.[70]

65. *Fairbanks Fire Fighters Ass'n, Local 1324 v. City of Fairbanks,* 48 P.3d 1165, 1168 (Alaska 2002) (holding appeal moot where relief had already been received).

66. 128 P.3d 732 (Alaska 2006).

67. *Id.* at 739–41.

68. *Id.* at 740 (footnote omitted).

69. *See Stalnaker v. Williams,* 960 P.2d 590, 597 (Alaska 1998) (noting Civil Rule 82 guidelines "offer one way to reach a reasonable award").

70. Alaska R. Civ. P. 82(b)(3).

The superior court here determined that a twenty percent fee was reasonable. The court also noted that equities favored giving an award because May received a windfall in this case in that he was allowed to participate in the fishery while his case was on appeal. The state, on the other hand, litigated for years despite prevailing at every stage on the issues now on appeal, and it did not receive a money judgment.

May's argument for overturning the twenty percent award appears to be an equitable one—that his "right to be treated the same as the next guy" was an important right "worth fighting for" and that his ability to participate in the fishery for all the years while the case was pending did not represent a windfall because fishing was May's way of life and involved hard work. Moreover, May argues that as soon as he found out about *Leask* he had the right to rely on the decision and expect the CFEC to apply it. Nothing in May's argument shows that the award was "manifestly unreasonable" as it would have to be for this court to reverse.[71] Moreover, May's argument that he litigated in good faith is immaterial because the twenty percent award does not rely on a lack of good faith. We hold that the superior court's award was not an abuse of discretion.

## V. CONCLUSION

The regulations, by their terms, require applicants to demonstrate past participation in the specifically designated area of the "specific Southeast herring purse seine fishery." May never claimed to have participated in that area. The fact that the CFEC erroneously awarded a permit to another individual who did not participate does not require that the CFEC repeat its error in May's case. We AFFIRM the CFEC Final Decision that May was ineligible to apply for a permit and AFFIRM the superior court's award of attorney's fees.

BRYNER, J., not participating.

---

**71.** *Palfy v. Rice,* 473 P.2d 606, 613 (Alaska 1970).