*Notice: This opinion is subject to correction before publication in the Pacific Reporter. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| AVCG, LLC, | ) | |
| | ) | Supreme Court No.: S-18170 |
| Appellant, | ) | |
| | ) | Superior Court No.: 3AN-20-06625 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF NATURAL RESOUCES, | ) | No. 7645 – April 7, 2023 |
| | ) | |
| Appellee. | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Herman G. Walker, Jr., Judge.

Appearances: Louisiana W. Cutler, Joan M. Travostino, and Siena M. Caruso, Dorsey & Whitney LLP, Anchorage, for Appellant. David A. Wilkinson, Senior Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

BORGHESAN, Justice

## I. INTRODUCTION

Alaska Venture Capital Group, LLC (AVCG) owned interests in oil and

gas leases on state lands on the North Slope.  AVCG sought the State's[1] approval to create overriding royalty interests on the leases.[2]  The Alaska Department of Natural Resources, Division of Oil and Gas denied AVCG's requests, explaining that the proposed royalty burdens jeopardized the State's interest in sustained oil and gas development.  AVCG appealed.  Five years later the DNR Commissioner affirmed.  The superior court then affirmed the Commissioner's decisions.  AVCG now appeals to us.

AVCG's primary argument is that the decisions improperly adopted a new regulation that did not undergo the rulemaking procedures of Alaska's Administrative Procedure Act (APA).  AVCG maintains that DNR's reliance on specific factors — in particular, the fact that the proposed ORRIs would create a total royalty burden of over 20% on the leases — amounted to adopting a regulation.  But applying existing statutory and regulatory standards to the particular facts of the case and explaining the importance of those facts in the analysis did not amount to a new regulation.  The 20% figure was a standard developed through a series of past adjudications, not a new standard that required rulemaking.

---

[1]     Several agencies and agents of the State are involved in this appeal:  the Alaska Department of Natural Resources (DNR); the Division of Oil and Gas (Division), a sub-agency of DNR; and the DNR Commissioner (Commissioner).  The Division is tasked with processing applications for new overriding royalty interests. The Commissioner is responsible for adjudicating appeals of Division decisions.  We use "DNR" when referring to the Division and the Commissioner collectively, or to the agency in general.

[2]     "[A]n overriding royalty interest (ORRI) . . . entitles [the holder] to a percentage of royalties from the oil and gas produced by the lease at the surface, when and if the lease becomes productive." *See PLC, LLC v. State, Dep't of Nat. Res.*, 484 P.3d 572, 574-75 (Alaska 2021); *see also Gottstein v. State, Dep't of Nat. Res.*, 223 P.3d 609, 611 n. 3 (defining "overriding royalty interest"); *Allen v. Alaska Oil & Gas Conservation Comm'n*, 1 P.3d 699, 700 n.1 (Alaska 2000) (same).  ORRI owners receive a fraction of proceeds from a lease without contributing to development or operations. Kimberlee Cagle et al., *Rekindling the Flame:  Oil and Gas Securitizations*, 20 PRATT'S ENERGY REP. 81, 83 (2020).

AVCG also argues that the decisions lacked a reasonable basis in fact and law and that, for some of its leases, no agency approval was required at all. We reject both arguments. The decisions to deny ORRIs had a reasonable basis, especially in light of missed production deadlines for some leases and the developmental stage of others. AVCG's argument that it did not need approval to create ORRIs on some leases is inconsistent with the language of and policy behind the applicable regulation.

Finally, AVCG raises constitutional claims. It argues that delay and an "ad hoc" decision-making process violated its procedural due process rights. But AVCG fails to establish prejudice arising from the delay, and the case-by-case exercise of discretion is both appropriate and required by regulation. It also argues that the denials constituted an uncompensated taking. Because AVCG's right to create ORRIs was expressly conditioned on DNR approval, lawfully denying this approval did not deprive AVCG of any property interest.

We affirm the superior court on all issues.

## II.    FACTS AND PROCEEDINGS

### A.    Oil And Gas Security Interests

This matter concerns three types of oil and gas security interests. Landowners that lease their lands for hydrocarbon production, including the State, typically reserve a *royalty interest* in production.[3] Royalty interests are independent from the costs of production.[4] The royalty owner receives a set fraction of the gross revenue the lessee receives from producing oil and gas.[5]

---

[3]     *See* Cagle et al., *supra* note 2, at 82.

[4]     *Id.*

[5]     *Id.*

The lessee typically has a *working interest,* an ownership share that conveys the right to explore, drill, and produce oil on the leased lands.[6] The owner of a working interest receives a share of production revenues that remain after royalties are paid.[7]

Finally, an *overriding royalty interest* (ORRI) is an additional royalty carved out from a lessee's working interest.[8] The owner of an ORRI is entitled "to a percentage of royalties from the oil and gas produced by the lease at the surface, when and if the lease becomes productive."[9] Like royalty interest owners, ORRI owners receive a fraction of proceeds from a lease without contributing to development or operations.[10] Adding an ORRI to an existing royalty interest reduces working interest holders' net revenue without decreasing production costs, increasing the ratio of risk to reward for developing a lease.[11] If a high royalty burden siphons too much profit from working interest owners, then they may lack adequate incentive to develop the prospect

---

[6] 11 Alaska Administrative Code (AAC) 88.185(37) (2023).

[7] *See* Cagle et al., *supra* note 2, at 82-83.

[8] *Id.* at 83.

[9] *PLC, LLC v. State, Dep't of Nat. Res.*, 484 P.3d 572, 574-75 (Alaska 2021) (citing *Gottstein v. State, Dep't of Nat. Res.*, 223 P.3d 609, 611 n.3 (Alaska 2010)).

[10] *Id.*

[11] *See* John K. H. Akers, Jr., *Overriding Royalty Interests: Pitfalls, Precedent, and Protection*, 50 Rocky Mt. Min. L. Inst. 21-1, 21-2 (2004) ("An adversarial relationship, the result of conflicting economic interests, exists between the operating and nonoperating interest owners in an oil and gas lease. . . . Owners of the latter, consisting of overriding royalty interests . . . expect their allotted share of oil and gas free of the expense of exploration, development, and operation — 'freeloaders' as perceived by the burdened operating interest owners.").

or to continue production when recovery becomes more expensive, especially in the event of changing economic conditions.[12]

The legislature has created a program of leasing state lands for oil and gas production, providing that "the people of Alaska have an interest in the development of the state's oil and gas resources to (A) maximize the economic and physical recovery of the resources; (B) maximize competition among parties seeking to explore and develop the resources; and (C) maximize use of Alaska's human resources."[13] Pursuant to this program, the Division may approve transfers of interests in state oil and gas leases, including transfers that entail the creation of ORRIs.[14] However, "[n]o transfer of an interest in a lease, oil and gas exploration license, or permit, including assignments of working or royalty interest, operating agreements, and subleases, is binding upon the state unless approved by the commissioner."[15] The Division will approve transfers "unless the commissioner makes a written finding that the transfer would adversely affect the interests of the state."[16] Once the Division approves a new ORRI, the owner of that ORRI may transfer it to others without seeking further approval.[17]

---

[12] *See id.*

[13] AS 38.05.180(a)(1).

[14] 11 AAC 82.605(a) (2018).

[15] 11 AAC 82.605(b).

[16] 11 AAC 82.605(c).

[17] 11 AAC 82.605(b) ("When transfers of overriding royalty are made after the initial separation from the working interest of the lease, executed or image copies of these transfers must be transmitted to the department without charge for filing in the appropriate case file. However, the commissioner will take no action and official status records will not be posted to reflect these transfers.").

## B.    AVCG's Proposals

In August 2014 AVCG and other working interest owners asked the Division to approve two agreements concerning two sets of oil and gas leases on the North Slope. Five leases jointly operated as the Southern Miluveach Unit (SMU) comprised AVCG's first set of working interests. AVCG also held full or partial working interests in 34 undeveloped leases. Each agreement proposed (1) assigning working interests to a group of purchaser entities and (2) creating ORRIs that AVCG and others would retain as partial compensation for the working interest transfer.

The Division asked Brooks Range Petroleum Corporation (Brooks Range), another developer that operated the SMU leases on behalf of AVCG and other working interest holders, to share details that would inform the Division's response to the proposed ORRIs. In an email to Brooks Range, the Division noted that the requested ORRIs would reduce the working interest holders' net revenue interest[18] to 77.5% for the SMU leases. The Division requested "an explanation as to how approving the ORRIs will not adversely affect the interests of the state, particularly with regards to the ability of working interest owners to explore and develop the leases."

Brooks Range responded to the Division's queries with a brief email and, later, a letter recommending that the Division approve AVCG's ORRI application. Brooks Range's initial email suggested that ORRIs already existing on the SMU leases would not burden the exploration and developments of those leases and that the proposed additional ORRIs would not hinder development because the entities that would hold the ORRIs also owned working interests. A more comprehensive set of arguments followed in Brooks Range's October 2014 letter. The October letter reiterated that the ORRIs already burdening the SMU leases did not preclude

---

[18]    "Net revenue interest" is a working interest owner's share of oil and gas production after deducting all burdens, such as royalties and overriding royalties. Cagle et al., *supra* note 2, at 83.

exploration and stated that the purchasing parties had accounted for the proposed additional ORRIs in their economic models. Brooks Range asserted that the proposed ORRIs would *promote* state interests by permitting the sellers to agree to a lower up-front cash payment — leaving the purchasers extra capital with which to develop the leases.

### C.     The Division's Decisions

The Division issued a decision regarding the SMU leases in October 2014 and a decision on the 34 undeveloped leases in March 2015. For both sets of leases the Division approved working interest transfers but denied the proposed ORRIs. The Division issued a detailed memo explaining each decision.

When the Division rejected AVCG's application to create new ORRIs on the SMU leases, it emphasized that the "specifics of the application[] and the activity in the unit" would drive its analysis. The Division explained that the proposed ORRIs "would leave current and future [working interest owners] with only 77.5% of the production revenue while bearing 100% of the costs of exploration and development." The proposed ORRIs, if approved, would "persist as long as the leases exist." Therefore, the Division explained, even if the current working interest holders were willing to operate under a high royalty burden, new ORRIs could discourage future assignment of the working interests. The Division also chronicled the applicants' exploration activities prior to their ORRI application. It pointed out that that the developers had failed to drill any wells during the unit approval period despite multiple deadline extensions and that the applicants had failed to provide required documentation.

The Division also responded to points in Brooks Range's letter. The Division noted that the applicants failed to address the long-term impacts of new ORRIs and their effect on the possibility of future assignments to new working interest owners. The Division concluded that "the likelihood that, in the long-term, an ORRI burden of this magnitude would discourage exploration and development of these leases, and that

the economic limit would be reached prematurely, creates a risk that is great enough to adversely affect the state's interests."

The Division also denied proposed ORRIs on AVCG's 34 undeveloped leases. Additional ORRIs, the Division wrote, would drop the working interest owners' net revenue interest from a range of approximately 78.3% to 83.3% across the leases to a range of 75.8% to 79.8%. As with the SMU leases, the Division found that this low net revenue interest, compounded by other concerns about the leases' long-term economic viability, would harm state interests.

### D.    The Commissioner's Decisions

AVCG appealed the Division's two ORRI denials to the Commissioner. Over five years later, in May 2020, the Commissioner affirmed both decisions. The Commissioner explained that when the Division determines whether to approve an application under 11 AAC 82.605(c), it "undertakes an analysis of the facts and circumstances underlying a transfer request, with the requested ORRI burden percentage in relation to the resulting total overall royalty burden . . . as an important primary consideration." The Commissioner elaborated upon her reasoning:

> Generally, the Division has viewed a total royalty burden of 20% or greater as excessively burdening a lease and adversely affecting its economic life. The disapproval of a transfer request application that would result in a 20% or greater total royalty burden is not a bright line rule. Rather, the total royalty burden is a critical variable analyzed by the Division. That is, depending upon the size and production profile of the field, an ORRI may be tolerated without significant impact to the economic life of the field. But in instances where, as here, a field has marginal reserves, requires more technical recovery methods, or has higher operating costs (amongst other circumstances), the Division has calculated that an excessive ORRI burden will most likely shorten economic field life inconsistent with the best interests of the State.

The Division had declined "most" ORRI requests resulting in a revenue burden over 20%, the Commissioner wrote, although she noted that the Division had previously approved a lease with a royalty burden above 20%. This discrepancy, she asserted, "only demonstrate[s] that . . . the Division does not employ a 'bright line rule,' " but rather conducts a case-by-case analysis.

The Commissioner also addressed other factors that the Division considered. These factors included "an appraisal of the financial fitness of the lessees, an evaluation of the reserves associated with the project, an understanding of the State's investment level and exposure, and the development of an overall commercial profile of the project." The Division had found that the assignees' funding structure would render the project financially viable without additional ORRIs and that the proposed ORRIs would result in 173,000 barrels of lost oil production, the Commissioner explained. The proposed ORRIs could therefore trigger a loss of over $1 million to the State. The Division also found that the missed production deadlines and request for additional ORRIs suggested the working interest owners were undercapitalized and "financially brittle," meaning that "development and sustained production were potentially at risk." This concerning behavior, in addition to the proposed total royalty burden of over 20%, led the Commissioner to uphold the Division's decision and deny AVCG's application to create new ORRIs for the SMU leases.

The Commissioner took a different approach to evaluating the 34 undeveloped leases. She described the leases as too early in the exploration phase for the Division to conduct its usual analysis. Because these leases remained in an exploratory phase, the Commissioner wrote, "a high ORRI burden posed a specific risk; it may take a decade or longer from the first exploration well to production, and circumstances can change greatly over that long of a time period." "Essentially, the requested transfer promised a percentage of undeterminable future earnings, a percentage that would persist until lease expiration, and therefore it possessed the potential to depress project economics to the point that [working interest owners] would

not sanction the project." The Commissioner upheld the Division's decision to deny new ORRIs for the 34 undeveloped leases.

### E.    Superior Court Appeal

AVCG appealed the Commissioner's decisions to the superior court, advancing several arguments. First, AVCG argued that the decisions denying its applications to create new ORRIs for the SMU leases and the 34 undeveloped leases had unlawfully created a regulation. AVCG asserted that the purported regulation established a 20% royalty threshold at which the burden shifted to the applicant to show the ORRIs would be in the State's interest. AVCG also argued that "ad hoc decision-making" and the long delay before the Commissioner issued her decision violated AVCG's due process rights; that the decisions rested on "speculation" about the future; and that some of the ORRIs did not require agency approval. The superior court rejected these arguments and affirmed the decisions.

AVCG appeals.

## III.    DISCUSSION

### A.    DNR Did Not Unlawfully Adopt A Regulation.

AVCG argues that the decisions reflect a new, uncodified rule: ORRI applications that would produce a total royalty burden exceeding 20% shift a burden from DNR to the applicant to show that additional ORRIs would not harm state interests. According to AVCG, this uncodified regulation also includes a set of factors that steer DNR's best interests analysis: the financial fitness of the lessees, the sufficiency of reserves associated with the project, the recovery methods and costs required to develop those reserves, the State's investment level and exposure, and compliance with past field commitments. Because DNR did not promulgate a regulation under the APA, AVCG argues, DNR's reliance on this supposed rule to deny AVCG's applications is invalid.

Among the APA's key requirements is the duty to adopt regulations through a formal rulemaking process that provides notice and an opportunity for public

involvement.[19]  "An agency should not have unfettered discretion to vary the requirements of its regulations at whim. . . . [T]his invites the possibility that state actions may be motivated by animosity, favoritism, or other improper influences."[20] We must balance these concerns with the practical realities of administrative governance.  Agencies are called on to apply statutory rules to particular and sometimes novel factual situations in the context of individual, case-by-case adjudications.[21] "[A]gencies must have some freedom to apply relevant statutes without the burden of adopting a regulation each time they do so,"[22] in part because "[p]roblems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule."[23]  "A requirement that each . . . interpretation be preceded by rulemaking would result in complete ossification of the regulatory state."[24]

We balance these competing policy goals — notice, consistency, flexibility, and efficiency — by distinguishing regulations from mere interpretations. The Alaska legislature has defined a regulation as "every rule, regulation, order, or standard of general application or the amendment, supplement, or revision of a rule,

---

[19]     *See* AS 44.62.180-44.62.290 (describing process for adopting administrative regulations, including notice of proposed action and opportunity for public comment).

[20]     *Jerrel v. State, Dep't of Nat. Res.*, 999 P.2d 138, 144 (Alaska 2000).

[21]     *See* AS 44.62.330-44.62.630 (establishing procedures for adjudication by administrative agencies).

[22]     *Chevron U.S.A., Inc. v. State, Dep't of Revenue*, 387 P.3d 25, 36 (Alaska 2016).

[23]     *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1086 (Alaska 2011) (quoting *Alyeska Pipeline Serv. Co. v. State, Dep't of Env't Conservation*, 145 P.3d 561, 573 (Alaska 2006)).

[24]     *Id.* (quoting *Alyeska*, 145 P.3d at 573).

regulation, order, or standard adopted by a state agency to implement, interpret, or make specific the law enforced or administered by [the agency]."[25] "The label an agency places on a policy or practice does not determine whether that rule falls under the APA."[26] Instead we consider substance.

An agency effectively adopts a regulation when it (1) implements, interprets, or makes specific a statutory directive that (2) impacts the agency's dealings with the public.[27] An agency does not meet the first prong of this test if it merely adopts a commonsense interpretation of existing requirements.[28] But if the agency's interpretation adds "requirements of substance," interprets the statute in an unforeseeable way, or represents a change in course, then it must use the APA's rulemaking process.[29] "Whether an agency action is a regulation is a question of law that does not involve agency expertise, which we review applying our independent judgment."[30]

Our analysis of whether DNR promulgated a de facto regulation proceeds in two parts. First, we conclude that DNR did not adopt a regulation when it identified the economic factors that inform its best interest analyses. DNR's focus on these factors was a commonsense and foreseeable application of the existing statutory and regulatory standard to the matter before it, and AVCG does not show that DNR's approach has changed. Second, we conclude that DNR did not adopt a new regulation when it

---

[25]     AS 44.62.640(a)(3).

[26]     *Jerrel v. State, Dep't of Nat. Res.*, 999 P.2d 138, 143 (Alaska 2000).

[27]     *Id.*; *see also* AS 44.62.640(a)(3).

[28]     *Chevron U.S.A., Inc. v. State, Dep't of Revenue*, 387 P.3d 25, 36 (Alaska 2016).

[29]     *Id.* at 36-37.

[30]     *Id.* at 35 (quoting *State, Dep't of Nat. Res. v. Nondalton Tribal Council*, 268 P.3d 293, 299 (Alaska 2012)).

explained that a total royalty burden over 20% is typically contrary to the State's interests. Because DNR appears to have distilled this guideline from a series of past adjudications, it did not adopt a new rule that requires rulemaking.

### 1. DNR did not effectively adopt a regulation when it identified the factors supporting its decision.

#### a. Identifying and discussing the factors supporting the decisions did not add requirements of substance to existing laws.

As noted above, an agency's interpretation of an existing statute or regulation requires rulemaking if it adds requirements of substance, is unforeseeable, or changes the agency's approach.[31] The factors that proved determinative in this matter — the total royalty burden, the financial fitness of the lessees, the project's reserves and overall commercial profile, and the State's investment level and exposure — do not bear these hallmarks of rulemaking.

Agencies add requirements of substance when they invent "specific criteria or values that clarif[y] the existing statutory or regulatory standard and require[] the public to comport with precise criteria not specified in existing rules."[32] In contrast, agency actions do not add requirements of substance if they merely "interpret[] a broad phrase" or apply a statutory standard to the facts of a particular case.[33] Our past decisions illustrate the difference between new criteria and commonsense interpretations of existing rules.

On the one hand, we have ruled that agencies must undertake rulemaking before imposing precise numeric requirements not specified in existing rules. *Jerrel v. State, Department of Natural Resources* concerned 11 AAC 60.070, which provided

---

[31] *Id.* at 36-37.

[32] *Id.* at 37.

[33] *Id.* at 38.

that "[a]ll livestock permitted on a state grazing lease shall be properly identified . . . . [T]he director may require that the livestock be tagged, dyed, or otherwise marked . . . in accordance with the annual operating plan."[34]  DNR informally ordered ranchers to mark their horses with marks "plainly distinguishable from a distance of 20 feet" and repeatedly rejected the ranchers' solutions as insufficiently permanent or visible.[35]  We agreed with the ranchers that the 20-foot visibility requirement was a regulation because it added specific criteria with which the ranchers were made to comply.[36]

In *Estrada v. State* the Department of Fish & Game announced that it would reduce the harvest limit for Kanalku Lake sockeye from 25 to 15 fish.[37]  Relying on *Jerrel*, we explained that the 15-fish limit "made specific a statutory requirement" and should have been adopted through rulemaking.[38]

And in *Burke v. Houston NANA, LLC*, the Alaska Workers' Compensation Board developed through adjudication a discovery rule that required an injured employee to request a reemployment eligibility evaluation within 90 days of when he

---

[34]    999 P.2d 138, 140 & n.3 (Alaska 2000).

[35]    *Id.* at 140.

[36]    *Id.* at 143-44.

[37]    362 P.3d 1021, 1022 (Alaska 2015).

[38]    *Id.* at 1024, 1026.  *See* AS 16.05.251(a)(3) ("The Board of Fisheries may adopt regulations it considers advisable in accordance with AS 44.62 (Administrative Procedure Act) for . . . setting quotas, bag limits, harvest levels, and sex and size limitations on the taking of fish . . . ."); AS 16.05.258(b) ("The appropriate board shall determine whether a portion of a fish stock or game population identified under (a) of this section can be harvested consistent with sustained yield.  If a portion of a stock or population can be harvested consistent with sustained yield, the board shall determine the amount of the harvestable portion that is reasonably necessary for subsistence uses . . . .").

knew or should have known that he might not be able to return to his job.[39] This discovery rule "modif[ied] the requirements employees must meet in order to qualify for an eligibility evaluation."[40] As in *Jerrel* and *Estrada*, the Board's adjudication introduced specific, inflexible requirements that would govern the public's access to agency services.[41]

On the other hand, agencies do not need to promulgate regulations when they merely apply an existing statutory or regulatory standard to the facts before them.[42] *Chevron U.S.A., Inc. v. State, Department of Revenue* concerned a dispute over the agency's discretion to aggregate production from different oil fields to determine whether the fields were "economically interdependent" for taxation purposes.[43] An oil company challenged the agency's application of this standard to particular fields, arguing that the agency should have promulgated a regulation.[44] The Department of

---

[39]    222 P.3d 851, 868 (Alaska 2010).

[40]    *Id.*; *see* AS 23.30.095(c) (detailing the information that a healthcare provider must supply in order for an injured worker to receive payments for continuing treatment).

[41]    *Id.*

[42]    *See Alaska Ctr. for the Env't v. State*, 80 P.3d 231, 242-44 & n.40 (Alaska 2003) (holding agency's determination that regulation governing "major energy facilities" did not apply to airport expansion was commonsense interpretation of regulatory definition); *Alyeska Pipeline Serv. Co. v. State, Dep't of Env't Conservation*, 145 P.3d 561, 563, 573 (Alaska 2006) (holding that agency did not enact regulation when it decided whether certain costs were among those agency could recoup from regulated party).

[43]    *Chevron U.S.A., Inc. v. State, Dep't of Revenue*, 387 P.3d 25, 29 (Alaska 2016) (applying AS 43.55.013(j) (repealed 2006) (permitting the Department of Revenue to aggregate two or more fields for taxation purposes "when economically interdependent oil or gas production operations are not confined to a single lease or property")).

[44]    *Id.* at 34.

Revenue's decision defined "economically interdependent" as operations that are "so integrated as to be reasonably treated as an economically unitary activity."[45]  The agency then explained the policy considerations underlying its decision, reasoning that there was " 'little reason to believe' that declining to aggregate [the fields in question] . . . 'would promot[e] additional development.' "[46]  Finally, the Department of Revenue focused on particular factors that led it to conclude the fields in question were economically interdependent:  "the use of common production facilities, the coordination of well production to deal with constrained capacity in shared production facilities, the use of backout volume and compensation arrangements, and the allocation of production to wells without exact metering."[47]  We reasoned that the Department of Revenue's attempt at defining the phrase "economically interdependent" did not "do much to clarify the [underlying statute] until that interpretation [was] applied to the specific facts of [the] case."[48]  And we concluded that the mere act of explaining why the particular facts of the case satisfied the statutory standard "did not add any specific criteria to the term 'economically interdependent' that went beyond the scope of the [statute's] existing language."[49]  Rather, the Department of Revenue's explanation "served only to clarify whether the broad term 'economically interdependent' covered the specific situation."[50]

The present case is more like *Chevron* than like *Jerrell*, *Estrada*, or *Burke*. The legislature tasked DNR with deciding whether the creation of new ORRIs on these

---

[45]     *Id.* at 37.

[46]     *Id.* at 34.

[47]     *Id.*

[48]     *Id.* at 38.

[49]     *Id.*

[50]     *Id.*

leases was contrary to the State's interest. As DNR pointed out in both the initial and final decisions, the legislature expressly described the nature of the State's interests in oil and gas leasing in statute: maximizing "economic and physical recovery of the resources," "competition among parties seeking to explore and develop the resources," and "use of Alaska's human resources."[51] Focusing on the first factor, DNR concluded that new ORRIs would undermine State interests because of facts specific to these leases: the total royalty burden with the proposed ORRIs, the financial condition of the working interest owners, the commercial profile of the projects (including progress and development stage), and the financial impact on the State. These factors were not mandatory, precise criteria with which all applicants must comply, like the 20-foot visibility requirement in *Jerrel* or the 15-fish limit in *Estrada*. Instead, they are akin to the factors that the Department of Revenue discussed in *Chevron* when deciding whether oil fields were economically interdependent. AVCG's position that an agency can never apply an existing statutory standard to the particular facts of a case without first identifying the key facts in rulemaking is neither supported by our precedent nor workable in practice.

### b. It was foreseeable that DNR would focus on the particular factors discussed in its decisions.

The factors that DNR considered were also foreseeable in light of the overarching statutory scheme. AVCG argues that the case-by-case approach to ORRI applications renders the process inscrutable and unpredictable. Because prior ORRI decisions are difficult to access, AVCG contends, regulated entities may not anticipate the factors that are central to the ORRI analysis. But AVCG's focus is too narrow.

---

[51] AS 38.05.180(a)(1).

We determine whether an agency's interpretation of statute is foreseeable by considering the statutory framework and its underlying purpose.[52] With oil and gas leasing, the legislature found that "the people of Alaska have an interest in the development of the state's oil and gas resources to . . . maximize the economic and physical recovery of the resources."[53] 11 AAC 82.605(c), in turn, requires the Commissioner to approve a lease transfer "unless . . . the transfer would adversely affect the interests of the state."

It is foreseeable that DNR would focus on a project's total royalty burden and other economic factors when evaluating an ORRI application. If a high royalty burden siphons too much profit from working interest owners, then they may lack adequate incentive to develop the leases or to continue production when recovery becomes more expensive.[54] The other economic factors mentioned are foreseeable for similar reasons. High royalty burdens are more likely to chill development of projects with fewer reserves (due to smaller economies of scale) or that require more difficult and expensive extraction methods. It also makes sense that DNR, tasked with protecting state interests, would exercise additional caution before permitting ORRIs that expose the State to losses. A reasonable developer should have foreseen that DNR might reject new ORRIs for projects that were already burdened with existing royalty

---

[52] *Chevron*, 387 P.3d at 39 ("DOR's Decision to interpret 'economically interdependent' such that 'economic substance . . . prevail[ed] over form' should therefore have been foreseeable in light of the ELF tax regime and the well-known purposes behind it; DOR's Decision was consistent with the legislature's intent." (alteration in original)).

[53] AS 38.05.180(a)(1)(A).

[54] *See* Akers, *supra* note 11, at 21-2 (explaining that working interest owners may perceive overriding royalty interest owners as "freeloaders").

interests and had already missed development targets — or were so early in development that future prospects were hard to evaluate.

AVCG argues that if DNR does not need to establish the factors upon which it relies for ORRI decisions through rulemaking, then other, more detailed regulations are superfluous. Not necessarily. We need not decide in this case whether the APA required that the content of various existing regulations — such as the coal permitting regulation AVCG cites[55] — be adopted through rulemaking. But we observe that the need for rulemaking depends in part on the clarity with which legislative policy is expressed in statute.

For example, the nature of the State's best interest is not clearly defined by statute for coal leasing and permitting.[56] Therefore a regulation setting forth the factors that must be considered when evaluating a coal prospecting application may be necessary to provide the public and regulated parties with foreseeability and consistency. Whether to allow coal exploration and production on a given parcel of land is an open-ended decision that entails balancing economic returns against the social and environmental effects of coal mining.

Whether to approve an overriding royalty interest on an oil and gas lease is a much narrower and more technical question. And the State's interests in this context are well-defined in statute: "maximiz[ing] the economic and physical recovery of the

---

[55]  11 AAC 85.200 (2018) (describing factors agency must consider when determining whether coal lease sale or prospecting permit is in State's best interests).

[56]  *See* AS 38.05.035(e) (providing that agency may "approve contracts for the sale, lease, or other disposal of available land, resources, property, or interests in them" upon written finding that State's interests will be best served); AS 38.05.145(a) (providing that coal deposits on state land are "subject to disposition under regulations . . . adopted by the commissioner"); AS 38.05.150(b)-(c) (providing that commissioner "may . . . offer the land or deposits of coal for leasing" and "may issue to qualified applicants prospecting permits" without describing how discretion to be exercised).

resources."[57]  This policy shapes DNR's analysis of when assignments of interests in oil and gas leases are consistent with the State's best interests.  And, as explained above, this express policy makes the agency's focus on the particular factors highlighted in this case foreseeable.

### c. AVCG does not show that the factors discussed in the definition reflect a changed interpretation of state interests.

Finally, AVCG has not shown that the Division's consideration of these factors represents a changed interpretation of state interests when deciding whether to approve ORRIs under 11 AAC 82.605.  The mere fact that an agency decides one case differently than past cases does not necessarily indicate a change in the governing standard.  The different result may instead reflect different underlying facts and circumstances.  For example, in *Chevron* the Department of Revenue reviewed its administrative precedent and, concluding that its past decisions arose from different factual scenarios, distinguished those decisions.[58]  We rejected the argument that the Department of Revenue had departed from its previous interpretation of statute, explaining that although the agency "may have changed the way it exercised its discretion[,] . . . its analysis in the Decision was not inconsistent with related, but not entirely analogous, precedent."[59]

---

[57]  AS 38.05.180(a).

[58]  *See Chevron, U.S.A., Inc. v. State, Dep't of Revenue*, 387 P.3d 25, 41 (Alaska 2016) ("After closely reviewing past precedent, DOR concluded that 'while the guidance provided by past administrative precedent is sparse, the applicable generality . . . seems to be that economic interdependence is shown by or associated with unified or integrated operations or enterprise encompassing the several leases or properties in question.'  Rather than disavowing precedent, DOR looked to its past decisions and interpretations of the Aggregation Statute and determined that its interpretation of 'economically interdependent' . . . did not conflict and was consistent with its prior decisions." (first alteration in original)).

[59]  *Id.*

Here too it appears that DNR's decisions reflect the particular facts of AVCG's application rather than a change in agency policy. AVCG fails to show that DNR did not consider these factors in past ORRI decisions.

AVCG argues that the decisions departed from previous applications of 11 AAC 82.605 because the decisions stated that "past decisions to approve ORRIs [do not] have a bearing on future decisions." AVCG appears to misunderstand the point. This statement was a response to the argument (made in Brooks Range's October 8, 2014 letter) that the SMU leases "were already burdened with an ORRI" that had not diminished the project's development potential. The decisions acknowledged this argument. The language AVCG highlights — that past ORRI decisions do not have a bearing on future ones — appears to be a response to that argument. And it is a reasonable response. Deciding that the project can support one ORRI does not mean that the project can support an additional ORRI creating a higher total royalty burden. Instead DNR can reasonably focus on "the specifics of the application" and the most up-to-date facts in making its decision.

### 2. DNR's numerical guideline does not violate the APA.

#### a. The numerical guideline is a permissible result of adjudication, not a product of unlawful rulemaking.

DNR's reliance on a 20% total royalty burden guideline raises a distinct question: when reliance on numerical standards requires rulemaking. Although the Division did not cite the 20% figure in its initial decisions, the Commissioner gave significant weight to the fact that AVCG's proposed ORRIs would create total royalty burdens that exceed 20%. "Generally," the Commissioner explained, "the Division has viewed a total royalty burden of 20% or greater as excessively burdening a lease and adversely affecting its economic life." Although the Commissioner labeled the total royalty burden a "critical variable," she clarified that 20% "is not a bright line rule." "[D]epending on the size and production profile of the field," she stated, "an ORRI may be tolerated without significant impact to the economic life of the field. But in instances

where . . . a field has marginal reserves, requires more technical recovery methods, or has higher operating costs (amongst other circumstances) . . . an excessive ORRI burden will most likely shorten economic field life inconsistent with the best interests of the State."

AVCG likens the 20% figure to the specific values at issue in *Jerrel* and *Estrada* — values that did not "simply implement . . . general requirements, but [made] them specific and [brought] them to bear on the public."[60]  According to AVCG, when the Commissioner applied the 20% guideline she adopted a new standard that implemented and made specific 11 AAC 82.605.  DNR, in contrast, characterizes a lease's total royalty burden as a "commonsense consideration."  Describing its concern over total royalty burdens exceeding 20% as an "internal guideline" rather than a bright line rule, DNR asserts it is only one of several variables used to forecast the impact of proposed ORRIs on an individual project.

"The label an agency places on a policy or practice does not determine whether that rule falls under the APA . . . ."[61]  Whether described as a threshold or a guideline, the 20% figure is a meaningful standard.  Had DNR simply adopted this 20% guideline based on policy rationales, it would have been an invalid act of rulemaking, just as in *Jerrel* and *Estrada*.  Giving a specific numerical value critical importance in a best interests analysis is adopting a standard of general application, even if that standard is flexible.  A "standard of general application"[62] is, of course, the very definition of a regulation.  And a standard in the form of a precise numerical value is not foreseeable based on the text of 11 AAC 82.605 or the definition of state interests in AS 38.05.180.

---

[60]    *Estrada v. State*, 362 P.3d 1021, 1025 (Alaska 2015).

[61]    *Jerrel v. State, Dep't of Nat. Res.*, 999 P.2d 138, 143 (Alaska 2000).

[62]    AS 44.62.640(a)(3).

Yet agencies may consider numerical values in their decisions without first adopting each value through rulemaking. Agencies "have the discretion to set policy by adjudication instead of rulemaking."[63] Indeed, agencies are *required* to conduct a reasoned analysis based on the facts and figures presented to them.[64] In this context it is reasonable and foreseeable that DNR would consider a lease's total royalty burden, along with other economic factors, when deciding whether a proposed ORRI is in the State's best interests. For example, if calculations showed that a project with a proposed total royalty burden of 25% would be profitable only at a price per barrel consistently above long-term projections, then DNR could reasonably conclude that the project is too marginal to bear the proposed ORRIs. We do not discourage agencies from using facts and figures to inform their decisions.

Moreover, agencies can and should look to their past decisions for guidance.[65] Agencies can sometimes discern a line or standard from past decisions — each based on reasoned analysis of particular facts — and trace that line forward to the present matter. Discerning a line and then deciding the present case in a consistent manner is not adopting a new standard; it is pointing out a standard that already exists. Applying standards that already exist does not require formal rulemaking because it does not present the dangers that the rulemaking process is designed to prevent: lack

---

[63] *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1086-87 (Alaska 2001) (quoting *Amanda Hess Pipeline Corp. v. Alaska Pub. Utils. Comm'n*, 711 P.2d 1170, 1178 (Alaska 1986)).

[64] *See Sagoonick v. State*, 503 P.3d 777, 803 (Alaska 2022) ("For questions of law involving agency expertise, we apply the reasonable basis standard and 'must confirm that the agency has genuinely engaged in reasoned decision making and must verify that the agency has not failed to consider an important factor in making its decision.' ") (alterations in original) (quoting *Alaska Ctr. for the Env't v. State*, 80 P.3d 231, 241 (Alaska 2003)).

[65] *See Chevron, U.S.A., Inc. v. State, Dep't of Revenue*, 387 P.3d 25, 41 (Alaska 2016) (approving agency's attempt to reconcile past decisions with matter at issue).

of notice and inconsistent treatment. Past decisions provide regulated entities with notice of the agency's expectations and allow courts and the public to verify that the agency's decision-making is consistent across parties and over time. Therefore, when an agency applies a standard distilled from previous adjudications to the facts of the matter before it, it need not adopt that standard through rulemaking.

Accordingly, we must decide whether the 20% total royalty guideline is a standard adopted by fiat — an act of unauthorized rulemaking — or a standard developed over the course of past adjudications. There are facts in the record to support both views. But because DNR represents that it developed the standard through adjudicating past ORRI applications, and because AVCG has not shown otherwise, we conclude that the 20% guideline is not a product of impermissible rulemaking.

Some facts suggest that adopting the 20% guideline amounted to unauthorized rulemaking. The Commissioner cited several other jurisdictions that promulgated a similar threshold through regulation, suggesting that the 20% value was developed by looking to other state agencies rather than to its own past decisions. The Commissioner cited only one specific past ORRI decision — an *approval* of a new ORRI for which the total royalty burden would exceed 20%. And the Commissioner described the focus on total royalty burdens over 20% as a "growing concern," suggesting that this figure has emerged as a discernible line only with more recent adjudications.

But other facts in the record support DNR's interpretation of events. First, AVCG never refuted the assertion that DNR has denied most ORRI separation requests resulting in a total royalty burden over 20%. Second, we presume that an adequate record exists of those past denials because DNR must issue a written rationale when it

denies an ORRI application.[66]  Therefore DNR must have recorded past ORRI denials and the reasons behind them.  "Where no evidence indicating otherwise is produced, the presumption of regularity supports the official acts of public officers, and courts presume that they have properly discharged their official duties."[67]  AVCG complains that prior ORRI decisions are difficult to access.  But AVCG also claims to have sought discovery into past decisions and did not represent that DNR declined to share those records or that they do not exist.[68]  Third and finally, the extensive record in this case, including DNR's calculations of the effects of proposed ORRIs on economic field life, supports the inference that the Division engaged in similar reasoned analyses of past applications.  Together, this evidence suggests that DNR derived its 20% guideline from past adjudications and that those decisions were available for regulated parties to examine.

Policymaking through adjudication has limits.  An agency may derive a standard through adjudication only by connecting the dots of previous adjudications, each based on individual analyses of particular facts.  If an agency pens a standard freehand in the course of a single adjudication, that is an improper act of rulemaking. If the standard articulated by the agency is inconsistent with past adjudications, then it is a new rule that requires rulemaking.  If there are no past decisions — or if those decisions are not available to the public — then the standard is likewise a new rule as

---

[66]     11 AAC 82.605(c).

[67]     *Wright v. State*, 501 P.2d 1360, 1372 (Alaska 1972) (quoting *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960)); *see also Pub. Safety Emps. Ass'n, AFSCME Local 803, AFL-CIO v. City of Fairbanks*, 420 P.3d 1243, 1252 (Alaska 2018) (requiring findings of fact to overcome the presumption of regularity).

[68]     Some data underlying past decisions may be confidential.  *See* AS 38.05.035(a)(8) (requiring agency to keep certain files and information confidential upon request, including geological data and financial information).  But AVCG has not represented that the agency's decisions are not available to review or unintelligible without confidential data.

far as the public is concerned, and rulemaking is required. Finally, even when policymaking through adjudication is permissible, agencies may prefer rulemaking to give the public clear guidance and obviate the risk that courts will deem their standard an unauthorized regulation.

In this case the 20% figure is a standard derived from a series of adjudications, not an act of rulemaking. DNR's reliance on this figure when evaluating AVCG's applications therefore did not violate the APA's rulemaking procedures.

### b. The agency did not adopt a "burden-shifting" rule.

AVCG argues that the 20% total royalty guideline operates as a threshold that shifts a burden to the ORRI applicant to "affirmatively prove that its ORRIs are in the best interest[s] of the State." This shift, AVCG contends, permitted DNR to deny AVCG's ORRI applications when the developers failed to provide sufficient evidence of economic viability. AVCG acknowledges that DNR also uses other factors, discussed above, to evaluate ORRI applications. But AVCG suggests that DNR only considers these other aspects of economic viability when proposed ORRIs exceed the 20% threshold. According to AVCG, DNR assigned ORRI applicants the burden of proving that additional ORRIs would not harm state interests and thereby engaged in improper rulemaking.

This characterization of the decisions is inapt. A total royalty burden over 20% does not shift a burden of proof from DNR to the applicant. 11 AAC 82.605 does not saddle DNR with the *burden* to prove that an ORRI will harm the State's interests. The regulation merely requires DNR to state its reasons for denying an application. The courts then review that decision under a deferential reasonable basis standard.[69] In these

---

[69] *Davis Wright Tremaine LLP v. State, Dep't of Admin.*, 324 P.3d 293, 299 (Alaska 2014) (describing reasonable basis test as "whether the agency's decision is supported by the facts and has a reasonable basis in law, even if we may not agree with the agency's ultimate determination").

proceedings the Division, observing that the requested ORRIs would reduce the working interest holders' net revenue interest to 77.5% for the SMU leases, asked Brooks Range to explain "how approving the ORRIs will not adversely affect the interests of the state." But this exchange did not shift a nonexistent burden of proof. Rather, the question gave interested parties an additional opportunity to fortify their application.

AVCG also mischaracterizes the relationship between the 20% total royalty guideline and other factors that DNR considered. DNR described a lease's total royalty burden as a primary consideration, but also stated that it appraises the financial fitness of the lessees, the reserves associated with the project, the State's investment level and exposure, and a project's overall commercial profile for each application. The record does not suggest that DNR considers other factors only when a proposed total royalty burden exceeds 20%.

### B. DNR's Decision-Making Procedure Was Lawful.

#### 1. DNR's decisions were supported by facts and had a reasonable basis in law.

AVCG next argues that DNR violated its own regulation by issuing ORRI denials that "lack evidence." According to AVCG, the decisions were too vague, especially where DNR conceded knowledge gaps around the 34 exploratory-phase leases. AVCG also proposes two additional factors that DNR should have considered: whether the proposed transaction, viewed as a whole and relative to alternatives, supports the State's goal to encourage development on the leases and whether the prospective ORRI holders are also working interest owners.

We "apply the reasonable basis standard to questions of law involving 'agency expertise or the determination of fundamental policies within the scope of the

-27- **7645**

agency's statutory functions,' "[70] including for disputes where, as here, "an agency's adjudication of a regulated party's claim 'requires resolution of policy questions [that] lie within the agency's area of expertise and are inseparable from the facts underlying the agency's decision.' "[71] When applying the reasonable basis test, "we seek to determine whether the agency's decision is supported by the facts and has a reasonable basis in law, even if we may not agree with the agency's ultimate determination."[72]

The challenged decisions easily pass muster. When evaluating the SMU leases, DNR used the information at its disposal about the size and production profile of the SMU field to estimate the State's financial exposure. Notably, when DNR initially approved the SMU lease aggregation in October 2011, it characterized many of the reserves as "[m]arginally economic." Brooks Range, which operated the SMU leases on behalf of AVCG and other working interest holders, repeatedly failed to meet development benchmarks. Brooks Range had promised that it would meet production deadlines by 2012. DNR granted the operator a two-year extension, but later discovered that the leases would not produce oil by the extended deadlines.

On appeal the Commissioner cited additional reasons to affirm the decisions. The Commissioner found that the project would be financially viable without additional ORRIs, that the proposed ORRIs would result in 173,000 barrels of lost oil production — amounting to a loss of over $1 million to the State — and that the working interest owners appeared to be undercapitalized and "financially brittle." In light of these factors it was reasonable to conclude that permitting an additional ORRI — which if assigned would make the project less profitable for working interest owners — would

---

[70] *Id.* (quoting *Marathon Oil Co. v. State, Dep't of Nat. Res.*, 254 P.3d 1078, 1082 (Alaska 2011)).

[71] *Marathon Oil*, 254 P.3d at 1082 (quoting *Earth Res. Co. v. State, Dep't of Revenue*, 665 P.2d 960, 964 (Alaska 1983)).

[72] *Davis Wright Tremaine*, 324 P.3d at 299 (quoting *Tesoro Alaska Petrol. Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)).

likely undermine the goal of maximizing oil production (and with it, the State's royalty revenues).

The Commissioner acknowledged the uncertainty in the analysis of the 34 undeveloped leases. For example, the Commissioner concluded that the undeveloped leases "possessed the potential to depress project economics to the point that [working interest owners] would not sanction the project," in part because "it may take a decade or longer from the first exploration well to production, and circumstances can change greatly over that long of a time period, including pricing, the understanding of the resource, and the associated costs." Although AVCG characterizes this reasoning as speculative, it is just as easily characterized as prudent and conservative. Given the uncertainty, it was reasonable to deny a transaction that could diminish the project's long-term profitability for working interest owners.

AVCG also argues that DNR should have considered whether the proposed transaction, viewed as a whole and relative to alternatives, supports the State's goal to encourage development on the leases and whether the prospective ORRI holders are also working interest owners. DNR did analyze the two factors that AVCG suggests; it merely reached a different conclusion than AVCG would have liked. DNR acknowledged that because the ORRI applicants were also working interest owners, the ratio of risk to reward for working interest holders would not immediately increase upon separation. In other words, separating ORRIs would not change working interest holders' financial incentive to develop a lease if the working interest owners themselves held the new ORRIs. But DNR went on to explain that ORRIs, once approved, could be freely transferred to other entities for the remaining term of the lease. DNR also acknowledged that the deals were structured to provide greater up-front capital, concluding that this arrangement "appeared to contradict the project's financial viability" and could signal that working interest owners "were undercapitalized and financially brittle." DNR was under no obligation to accept the purchasers' economic forecasting. Although AVCG may disagree with DNR's interpretations of the parties'

incentives, the financial structure of the deals, and the purchasers' modeling, DNR's analysis was reasonable in light of the facts before it.

### 2. AVCG was required to obtain DNR's approval to create the ORRIs.

In the alternative, AVCG argues that it need not obtain DNR's approval for new ORRIs on leases that are already burdened with existing ORRIs. This argument misreads the applicable regulation, which provides that "[w]hen transfers of overriding royalty are made *after the initial separation from the working interest* of the lease . . . the commissioner will take no action."[73] As DNR explained, this provision applies only when a developer wishes to transfer an existing ORRI to a new owner, not when it seeks to create a new ORRI. A new ORRI carves out a royalty interest from a working interest, and therefore constitutes an assignment that is not binding on the agency without approval.[74]

We defer to an agency's interpretation of its own regulation unless that "interpretation is plainly erroneous and inconsistent with the regulation."[75] DNR's position that a newly created ORRI is not binding on the State without its approval is consistent with the regulation's plain language and with its purpose: to protect the State's interests as the lessor. As described above, new ORRIs may decrease working interest owners' financial incentive to develop a lease by increasing the lease's total royalty burden. If a lease produces less oil then the State receives fewer royalties. By contrast, transferring an existing ORRI does not change the total royalty burden on a lease and therefore does not affect the State's interests. That is why the regulation does

---

[73] 11 AAC 82.605(b) (emphasis added).

[74] *Id.*

[75] *Kuzmin v. State, Com. Fisheries Entry Comm'n*, 223 P.3d 86, 89 (Alaska 2009) (quoting *Copeland v. State, Com. Fisheries Entry Comm'n*, 167 P.3d 682, 683 (Alaska 2007)).

not require DNR approval of ORRI transfers "after the initial separation from the working interests."

AVCG also argues that DNR's explanation was a covert regulation that should have been promulgated via APA rulemaking. But this decision is an "obvious, commonsense interpretation" — essentially the plain language of the regulation.[76] The regulation provides that a new ORRI is not binding on the State without DNR approval. We therefore reject AVCG's argument that DNR approval was not required to create a new ORRI.

### C.    DNR Did Not Violate AVCG's Constitutional Rights.

AVCG raises three constitutional claims. First, AVCG argues that the five-year delay in resolving its initial appeal violated its procedural due process rights. Second, AVCG characterizes DNR's decision-making process as "ad hoc" and claims that this procedural deficiency likewise denied due process. Third and finally, AVCG argues that the decisions constituted a taking of property requiring compensation. We "review constitutional questions . . . de novo, and . . . 'adopt the rule of law that is most persuasive in light of precedent, reason, and policy.' "[77]

#### 1.    The five-year delay in resolving the administrative appeal did not violate due process.

We have explained that "delay can constitute a violation of due process . . . in certain civil contexts, if the delay causes the deprivation of a private

---

[76]    *Chevron U.S.A., Inc. v. State, Dep't of Revenue*, 387 P.3d 25, 36 (Alaska 2016) (quoting *Alyeska Pipeline Serv. Co. v. State, Dep't of Env't Conservation*, 145 P.3d 561, 573 (Alaska 2006)).

[77]    *Dennis O. v. Stephanie O*., 393 P.3d 401, 405-06 (Alaska 2017) (quoting *Jerry B. v. Sally B.*, 377 P.3d 916, 924-25 (Alaska 2016)).

interest."[78]  "But we have never held that delay alone, with no accompanying prejudice, constitutes a violation of the right to due process."[79]  The five-year gap between AVCG's initial appeal to the Commissioner and her response is troubling.  But we affirm the superior court's decision that the delay did not violate due process because AVCG failed to show prejudice.

In *Brandal v. State, Commercial Fisheries Entry Commission*, the Commission took 22 years to decide a fishing permit appeal.[80]  We characterized the *Brandal* delay as "inexcusable" and recognized that the applicant stood to suffer "significant harm" when the Commission denied him a permit required to continue his commercial fishing career.  But we denied the due process claim because the delay itself — over four times the delay AVCG faced here — did not prejudice the applicant.[81]  AVCG, like the claimant in *Brandal*, conflates the effect of the denial with the effect of the delay.  AVCG contends that the delay interfered with its work on the leases and commercial relations with other working interest holders.  But AVCG failed to specify, before the superior court or before us, *how* the delay interfered with its work or relationships.  The *Brandal* applicant's claim that the delay "lulled him into not learning another occupation" was unavailing because he had ample notice that the Commission was likely to reject his application, including two initial decisions to that effect.[82]  The Division likewise initially denied AVCG's ORRIs.  AVCG therefore had ample notice that a favorable outcome was not a sure bet.  Because AVCG failed to demonstrate to

---

[78]     *Brandal v. State, Com. Fisheries Entry Comm'n*, 128 P.3d 732, 740 (Alaska 2006).

[79]     *Id.*

[80]     *Id.* at 735.

[81]     *Id.*

[82]     *Id.*

the superior court any actual prejudice it suffered as a result of the five-year delay, we affirm the superior court's ruling that the delay did not deprive AVCG of due process.

### 2. DNR's decision-making was not so ad hoc as to violate due process.

AVCG also argues that DNR's case-by-case approach to ORRI approvals, unconstrained by regulation, is so ad hoc as to violate due process. AVCG contends that DNR singled out AVCG by applying the analytical factors described in the decisions. The superior court rejected this argument, reasoning that DNR's consideration of several variables and its approach to past applications showed it was not acting in an ad hoc fashion, in contrast to the agency's ad hoc adoption of a new standard in *Jerrel*.[83]

We agree with the superior court's reasoning. Truly ad hoc decision-making is impermissible. But to hold that all case-by-case determinations violate due process would eliminate a cornerstone of administrative law: the delegation of discretionary decision-making to agency experts.[84] In this case DNR reasonably applied the statutory and regulatory standards to particular facts based on evidence supplied by the applicant. It also applied a standard derived from and consistent with past decisions. This approach did not violate AVCG's due process rights.

---

[83] *Jerrel v. State, Dep't of Nat. Res.*, 999 P.2d 138 (Alaska 2000).

[84] *See Chevron U.S.A., Inc. v. State, Dep't of Revenue*, 387 P.3d 25, 36 (Alaska 2016) ("[N]early every agency action is based, implicitly or explicitly, on an interpretation of a statute or regulation authorizing it to act." (quoting *Alyeska Pipeline Serv. Co. v. State, Dep't of Env't Conservation*, 145 P.3d 561, 573 (Alaska 2006))).

### 3. DNR's decisions did not constitute a taking.

Finally, AVCG argues that the decisions were an uncompensated taking in violation of the Alaska Constitution.[85] AVCG's argument relies on our decision holding that the State may need to compensate landowners if it publicly states a present and concrete intention to condemn their parcels of land.[86] AVCG does not explain how that case supports the proposition that denying a lessee's request to separate royalties from the working interest in a hydrocarbon lease amounts to a taking of the lessee's interest — especially when the lessee's right to make this kind of assignment is expressly conditioned on the State's approval.[87] The lawful denials of AVCG's ORRI applications did not deprive AVCG of any property interest to which it had a right.[88]

## V. CONCLUSION

We AFFIRM the decision of the superior court affirming DNR's decisions.

---

[85] Alaska Const. art. I, § 18 ("Private property shall not be taken or damaged for public use without just compensation."). AVCG only briefly raised this argument before the superior court, and the superior court did not address it.

[86] *See Joseph M. Jackovich Revocable Tr. v. State, Dep't of Transp.*, 54 P.3d 294, 295, 298-99 (Alaska 2002).

[87] 11 AAC 82.605(b) (requiring Commissioner approval of interest assignments).

[88] *See Brandal v. State, Com. Fisheries Entry Comm'n*, 128 P.3d 732, 739 (Alaska 2006) (explaining that an applicant lacked a "private interest in receiving a permit to which he is not legally entitled" (quoting *State, Dep't of Health & Soc. Servs. v. Valley Hosp. Ass'n, Inc.*, 116 P.3d 580, 583 (Alaska 2005))).